UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GWENDOLYN CARSWELL, individually and as dependent administrator of, and on behalf of, the ESTATE OF GARY VALDEZ LYNCH, III, and GARY VALDEZ LYNCH, III'S heirs-at-law, | § § § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:20-cv-02935-N |
| HUNT COUNTY, TEXAS; GEORGE A. CAMP; JANA R. CAMPBELL; HELEN M. LANDERS; KENNETH R. MARRIOTT; KOLBEE A. PERDUE; TERI J. ROBINSON; VI N. WELLS; and SCOTTY D. YORK, | § § § § § § § § | JURY DEMANDED |
| Defendants. | § § | |

## FIRST AMENDED PLAINTIFF'S ORIGINAL COMPLAINT

> **This is a case of a tragic death of a 32-year-old male inmate which could have easily been avoided. Defendants ignored Gary Lynch's dire medical condition, and his and other inmates' pleas for help. Defendants' deliberate indifference and objective unreasonableness caused Gary's unnecessary suffering and death.**



Table of Contents

I.      Introductory Allegations ........................................................................4

    A.      Parties...........................................................................................4

    B.      Jurisdiction and Venue.................................................................7

II.     Factual Allegations ...............................................................................8

    A.      Introduction..................................................................................8

    B.      Gary's Incarceration and Death in the Hunt County Jail............8

        1.      Introduction.........................................................................8

        2.      Witness Statements ...........................................................10

            a.      Bixler, Michael S. – Officer (Badge No. 3637)......10

            b.      Brookins, Jerrell Lee – Inmate ................................12

            c.      Cole, Eugene – Inmate ............................................13

            d.      Grigsby, Donald R. – Inmate ..................................19

            e.      Hobdy, Lee Clinton – Inmate..................................20

            f.      Hunter, Robert T. – Sergeant (Badge No. 3821) ....22

            g.      Jones, Roger Junior - Inmate ..................................23

            h.      Landers, Helen M. – Medical Officer (Badge No. 3704)
                    ................................................................................24

            i.      Leevey, Roy D. – Sergeant (Badge No. 2725) ........25

            j.      Parker, Antonio Dimitri – Inmate ...........................25

            k.      Robinson, Teri J. – (Badge No. 3337) ....................26

            l.      Smith, Jerome Antwone – Inmate............................27

        3.      Death Reports....................................................................28

            a.      Autopsy – Dallas County Medical Examiner ..........28

            b.      Inmate Death Reporting Form – Hunt County Sheriff's
                    Office ......................................................................29

            c.      Inquest Report – Judge Money ................................30

    C.      Investigation by Hunt County Sheriff's Department........................30

    D.      Defendants' Knowledge and Education.............................................36

    E.      *Monell* Liability of Hunt County ....................................................45

        1.      Introduction.......................................................................45

        2.      Hunt County Policies, Practices, and/or Customs ..............47

    3.  Texas Commission on Jail Standards: Hunt County Jail Failed Inspections ....................................................................................... 52

    4.  Other Incidents ................................................................................. 58

III. Causes of Action ...................................................................................................... 61

  A. 14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson* ................... 61

  B. Remedies for Violation of Constitutional Rights and Other Federal Claims ................................................................................................................ 64

  C. Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ..................................................... 65

  D. Cause of Action Against Hunt County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights ................................................................... 69

IV. Concluding Allegations and Prayer ........................................................................ 71

  A. Conditions Precedent ......................................................................................... 71

  B. Use of Documents at Trial or Pretrial Proceedings ......................................... 71

  C. Jury Demand ...................................................................................................... 72

  D. Prayer ................................................................................................................. 72

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff files this complaint and for cause of action will show the following.

I.      Introductory Allegations

A.      Parties

1.      Plaintiff Gwendolyn Carswell ("Gwendolyn Carswell" or "Ms. Carswell") is a natural person who resided in, was domiciled in, and was a citizen of Texas at all relevant times. Gwendolyn Carswell was Gary Valdez Lynch, III's biological and legal mother.  Decedent Gary Valdez Lynch, III is referred to herein at times as "Mr. Lynch" or "Gary."  Ms. Carswell sues in her individual capacity and as the Dependent Administrator of the Estate of Gary Valdez Lynch, III, Deceased.  Ms. Carswell, when asserting claims in this lawsuit as the Dependent Administrator, does so in that capacity and on behalf of the estate and all of Gary's heirs  (including Gary's heirs-at-law, including: Gwendolyn Carswell (Gary's mother), Shonqua Franklin (Gary's half-sister), Tywana Cobb (Gary's half-sister), Michael Lynch (Gary's half-brother), Roderick Cobb (Gary's half-brother), Gary Valdez Lynch, Jr. (Gary's half-brother), Shonda Runnel (Gary's half-sister), Alicia Gentry (Gary's half-sister), and Ashley Gentry (Gary's half-sister).  All of the people in the immediately preceding sentence are collectively referred to herein as the "Claimant Heirs."  Ms. Carswell asserts claims on behalf of, and seeks all survival damages and wrongful death damages available to, herself individually and Claimant Heirs.  Letters of dependent administration were issued to Ms. Carswell on or about September 8, 2020, in Cause Number 18793, in the County Court at Law No. 2 of Hunt County, Texas, in a case styled *Estate of Gary Valdez Lynch, III, Deceased.*

2.      Defendant Hunt County, Texas ("Hunt County") is a Texas county.  Hunt County was served with process in this case, and it has made an appearance.  Hunt County acted or failed to act at all relevant times through its employees, agents, representatives, jailers, and/or chief

policymakers, all of whom acted under color of state law and in the course and scope of their duties for Hunt County at all relevant times, and is liable for such actions and/or failure to act to the extent allowed by law (including but not necessarily limited to law applicable to claims pursuant to 42 U.S.C. § 1983 for violation of the United States Constitution).  Hunt County's policies, practices, and/or customs were moving forces behind, caused, and/or were proximate causes and/or producing causes of constitutional violations, and resulting damages and death, referenced in this pleading.

3.    Defendant George A. Camp (sometimes referred to herein as "Mr. Camp" or "Officer Camp") is a natural person who resides and is domiciled in Texas.  Mr. Camp was served with process in this case and has made an appearance.  Mr. Camp is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Camp was employed by Hunt County at all such times and acted or failed to act in the course and scope of his duties for Hunt County.

4.    Defendant Jana R. Campbell (sometimes referred to herein as "Ms. Campbell" or "Officer Campbell") is a natural person who resides and is domiciled in Texas.  Ms. Campbell was served with process in this case and has made an appearance.  Ms. Campbell is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Ms. Campbell was employed by Hunt County at all such times and acted or failed to act in the course and scope of her duties for Hunt County.

5.    Defendant Helen M. Landers (sometimes referred to herein as "Ms. Landers," "Officer Landers," and/or "Medical Officer Landers") is a natural person who resides and is domiciled in Texas.  Ms. Landers was served with process in this case and has made an appearance.  Ms. Landers is being sued in her individual capacity, and she acted at all relevant times under color

of state law.  Ms. Landers was employed by Hunt County at all such times and acted or failed to act in the course and scope of her duties for Hunt County.

6.       Defendant Kenneth R. Marriott (sometimes referred to herein as "Mr. Marriott" or "Officer Marriott") is a natural person who resides and is domiciled in Texas.  Mr. Marriott was served with process in this case and has made an appearance.  Mr. Marriott is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Marriott was employed by Hunt County at all such times and acted or failed to act in the course and scope of his duties for Hunt County.

7.       Defendant Kolbee A. Perdue (sometimes referred to herein as "Mr. Perdue" or "Officer Perdue") is a natural person who resides and is domiciled in Texas.  Mr. Perdue was served with process in this case and has made an appearance.  Mr. Perdue is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. Perdue was employed by Hunt County at all such times and acted or failed to act in the course and scope of his duties for Hunt County.

8.       Defendant Teri J. Robinson (sometimes referred to herein as "Ms. Robinson" or "Officer Robinson") is a natural person who resides and is domiciled in Texas.  Ms. Robinson was served with process in this case and has made an appearance.  Ms. Robinson is being sued in her individual capacity, and she acted at all relevant times under color of state law.  Ms. Robinson was employed by Hunt County at all such times and acted or failed to act in the course and scope of her duties for Hunt County.

9.       Defendant Vi N. Wells (sometimes referred to herein as "Ms. Wells," "Officer Wells," and "Nurse Wells") is a natural person who resides and is domiciled in Texas.  Ms. Wells was served with process in this case and has made an appearance.  Ms. Wells is being sued in her

individual capacity, and she acted at all relevant times under color of state law.  Ms. Wells was employed by Hunt County at all such times and acted or failed to act in the course and scope of her duties for Hunt County.

10.     Defendant Scotty D. York (sometimes referred to herein as "Mr. York," "Officer York," or "Sergeant York") is a natural person who resides and is domiciled in Texas.  Mr. York was served with process in this case and has made an appearance.  Mr. York is being sued in his individual capacity, and he acted at all relevant times under color of state law.  Mr. York was employed by Hunt County at all such times and acted or failed to act in the course and scope of his duties for Hunt County.  George A. Camp, Jana R. Campbell, Helen M. Landers, Kenneth R. Marriott, Kolbe A. Perdue, Teri J. Robinson, Vi N. Wells, and Scotty D. York are collectively referred to herein as the "Individual Defendants."

### B.     Jurisdiction and Venue

11.     The court has original subject matter jurisdiction over this lawsuit according to 28 U.S.C. § 1331 and 1343(4), because this suit presents a federal question and seeks relief pursuant to a federal statute providing for the protection of constitutional rights.  This suit arises under the United States Constitution and 42 U.S.C. § 1983.  The court has personal jurisdiction over Hunt County because it is a Texas county.  The court has personal jurisdiction over the Individual Defendants because they reside and are domiciled in, and are citizens of, Texas.

12.     Venue is proper in the Dallas Division of the United States District Court for the Northern District of Texas, pursuant to 28 U.S.C. § 1391(b)(2).  A substantial part of the events or omissions giving rise to claims in this lawsuit occurred in Hunt County, which is in the Dallas division of the United States District Court for the Northern District of Texas.

II.    Factual Allegations

    A.    Introduction

13.    Plaintiff provides in the factual allegations sections below the general substance of certain factual allegations.  Plaintiff does not intend that those sections provide in detail, or necessarily in chronological order, any or all allegations.  In fact, a significant portion of this pleading is organized not in chronological order but instead in alphabetical order as to witnesses providing statements.  Plaintiff intends that factual allegations sections below provide Defendants sufficient fair notice of the general nature and substance of Plaintiff's allegations, and further demonstrate that Plaintiff's claim(s) have facial plausibility.  Whenever Plaintiff pleads factual allegations "upon information and belief," Plaintiff is pleading that the specified factual contentions have evidentiary support or will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.  Moreover, where Plaintiff quotes a document, conversation, or recording verbatim, Plaintiff has done Plaintiff's best to do so accurately and without any typographical errors.   Finally, the Supreme Court has made clear that Plaintiff need only plead factual allegations showing plausible claims and need not even identify specific constitutional provisions violated by Defendants.

    B.    Gary's Incarceration and Death in the Hunt County Jail

        1.    Introduction

14.    Gary was born in 1987, and he was only 32 years old at the time of his tragic and unnecessary death on February 23, 2019 in the Hunt County jail.  Gary was in the Hunt County jail as a pre-trial detainee.  He was survived by a number of family members, including his mother. Individual Defendants' deliberate indifference, and objective unreasonableness, in their actions and inaction, and Hunt County's policies, practices, and/or customs, caused, were proximate causes of, and were producing causes of Gary's suffering and death and all other damages set forth

and/or referenced in this pleading.  General details regarding Gary's incarceration and death are set forth below, in the form of relevant summaries of statements of persons involved, and referenced documents.  Thus, this portion of the pleading provides just a general summary of some events.

15.   Gary was processed into the Hunt County jail on February 12, 2019 at approximately 4:35 p.m.  He was then housed from February 19, 2019 through February 22, 2019 in Tarrant County, with other Hunt County jail inmates, while emergency repairs to gas line(s) at the Hunt County jail were performed.  According to Hunt County records, on Tuesday, February 19, 2019, someone discovered a gas leak in the jail.  Atmos arrived at the jail and shut off the gas until repairs could be made.  Hunt County jail staff evacuated all prisoners from the Hunt County jail no later than 5:00 p.m., taking some to the Greenville Police Department, others to Hopkins County, and others to Tarrant County.  The jail sent guards to Tarrant County to guard prisoners taken to that location.  Maintenance crews and plumbers worked that week to repair the gas leak. Late Friday afternoon, February 22, 2019, the facility passed inspections, and the gas was restored. At approximately 9:28 p.m. on Friday night, Gary and some other inmates returned to the Hunt County jail from Tarrant County.  Gary was placed into a cell, with other inmates, at approximately 9:35 p.m.  On February 23, 2019, at approximately 11:18 a.m., jail and medical personnel responded to Gary's cell after other inmates reported Gary's death.  Witness statements provide more information regarding events leading up to and Gary's death.

16.   Plaintiff does not allege in this pleading that healthcare provided to Gary was negligently provided, or that medical malpractice is what lead to Gary's death.  Rather, Plaintiff alleges that there was wholesale disregard for Gary's serious, like-threatening medical issues and that no medical treatment was provided Gary to treat those issues.  This is not a case in which

some medical care was provided but was inadequate, but is instead a case in which no medical care was provided to address life-threatening medical issues which resulted in Gary's death. Individual Defendants ignored Gary's serious medical issues and failed to provide and/or obtain any medical treatment at all for Gary's obvious issues described in this pleading. If they had done so, Gary would not have died.

2.    Witness Statements

a.    Bixler, Michael S. – Officer (Badge No. 3637)

17.    Officer Michael S. Bixler, upon information and belief a Hunt County employee, wrote a statement regarding Gary's death, indicating that other involved officers were Captain Sherman, Lieutenant Stroud, Sergeant Hunter, Sergeant Leevey, Sergeant Jordan, Officer Briggs, Officer T. Robinson, Officer Bragg, Officer Lewis, Officer Dressel, Officer Norris, and Medical Officer Landers. Officer Bixler indicated that he was by the dress-out area in Intake, on February 23, 2019, when he heard a Code Blue over the radio. He and Sergeant Hunter went to Cell NE 319. This was the cell in which Gary and seven other inmates – apparently all African-American – were incarcerated.





18.     Officer Lewis, Medical Officer Landers, and Officer Bixler all went into Cell 319. They saw Gary laying on the top bunk, furthest from the door, with his eyes open.  There was a white substance on and around Gary's mouth.  Emergency treatment was provided, but it was too late for Gary.  Upon information and belief, Gary's death was no surprise to Individual Defendants due to their knowledge, through communications with each other and other Hunt County employees regarding Gary and his ongoing serious illness, that Gary had needed emergency medical treatment for some time.

### b.     Brookins, Jerrell Lee – Inmate

19.     Jerrell Brookins was incarcerated during at least a portion of the same time period Gary was incarcerated in the Hunt County jail, when Hunt County inmates were removed from the Hunt County jail due to a gas leak and temporarily housed in a Tarrant County facility.  Mr. Brookins was not housed in the same cell or pod as Mr. Lynch, but he was in the same hallway in which Gary collapsed.  Mr. Brookins was about 10-15 feet up a long hallway from Gary when Gary collapsed.  Gary was further up in the line because of his medical condition.  People with medical conditions were the first to be housed.  Mr. Brookins did not know specifics about Gary's medical condition, but he had heard that Gary had chest problems.  Upon information and belief, all Defendants had also heard about Gary's "chest problems," and knew enough to know that Gary needed emergency medical treatment away from the jail.  Upon information and belief, Individual Defendants had learned about Gary's serious medical issues through either firsthand observation, discussion with other Hunt County jail employees while going about their day-to-day duties, shift briefings, and/or reviewing documents providing information regarding shift events and/or Gary's incarceration.  Further, upon information and belief, all Defendants, as is common knowledge, knew that someone with significant chest pain and/or chest problems should be taken to the local emergency department as soon as possible due to the risk of heart attack and/or similar serious

cardiovascular issues.

20.     As prisoners were being housed in Tarrant County, according to Mr. Brookins, Gary collapsed in the hallway.  Mr. Brookins, when using the word "collapsed," means that Gary experienced a kind of faint.  Gary slowly fell.  He was kind of conscious but off guard a little bit, or off-task.  Mr. Brookins saw Gary sitting in the hallway leaning against the wall, and holding his chest.  Mr. Brookins could not tell if Gary was panting.  Mr. Brookins heard Gary say, more than once, "I need some water.  My equilibrium is off balance."  It appeared to Mr. Brookins that Gary did not have the energy to hold himself up.

21.     Mr. Brookins heard Sergeant York say to Gary, "Lynch, get up.  We don't have time for your B.S."  Sergeant York said as much even though the people closest to Gary were saying things like, "He's not playing;" "He needs some water;" and "He's serious."  Jail staff, including Sergeant York, did not act like it was a medical emergency, but instead picked Mr. Lynch up and put him into an empty cell.  However, upon information and belief, it was evident to Sergeant York and others nearby that Gary was seriously ill, through comments made, how Gary looked, and Gary's inability to stand.  Upon information and belief, Sergeant York did nothing at that time, or later, to obtain obvious needed life-saving medical treatment for Gary.  Further, upon information and belief, when looking at Gary, Sergeant York knew that Gary needed immediate emergency medical treatment for a serious medical issue.

c.     Cole, Eugene – Inmate

22.     Eugene Cole was incarcerated at the Hunt County jail for at least a portion of the time period when Gary was incarcerated, and he was present when Gary died.  He heard Gary breathing hard and moaning in pain.  About 30 minutes afterward, Mr. Cole heard one long breath of air from Gary and observed Gary's last movements before death.  He recalls Medical Officer Landers and other officers coming to the cell.

23.     Mr. Cole recalls that, when they slept in that same cell, one bunk or so apart, that Gary would make noises in his sleep every night.  He would ask Gary if he was alright.  Mr. Cole also "use to tell every nurse and officer that worked over on NE Hallway something was wrong with Mr. Lynch."  Upon information and belief, all Individual Defendants were included in that group of people.  Further, upon information and belief, there were other Hunt County employees who worked on NE Hallway, where Gary was incarcerated, who were also aware of Gary's serious medical condition.  Upon information and belief, it was common knowledge among Individual Defendants that Gary was seriously ill and generally unable to even leave his bunk, and that he needed immediate medical treatment for a serious medical issue.  Upon information and belief, they learned this through typical workplace communications regarding inmates, information obtained at shift-change briefings, and observation of and knowledge about Gary.

24.     Mr. Cole also thought that "[t]hey did not care."  Upon information and belief, he had that thought because Hunt County employees and representatives failed and refused to respond to the repeated requests for medical treatment.  The facts leading to Gary's death are a classic single-incident liability pattern.  The number of people who knew about Gary's serious medical condition, and who likewise failed and refused to do anything, demonstrates a policy, practice, and/or custom of Hunt County of failing and/or refusing to provide needed medical care to inmates.  Regardless, Hunt County is still liable for Gary's death, even if single-incident liability analysis does not apply, due to other Hunt County policies, practices, and/or customs referenced in this pleading.

25.     Gary was always telling Mr. Cole "and everyone else" that his heart and chest were hurting.  Mr. Cole also wrote:

> Every jailer I told did not give a damn about Mr. Lynch.  They always blew it off talking about he will be alright.  And the nurses to [sic].  If they cared they would

> have helped him when he told them he was hurting.  On[e] time Mrs. Landers
> (nurse) told me to look after him which I did the best I can.  But I told her look you
> wrong.  And the head nurse even told me to keep an I [sic] on him.

Upon information and belief, Mr. Cole was referring to Defendant Jana R. Campbell.  Mr. Cole

also said that Gary would not "eat for days sometimes," and "complained about his heart all the

time."  Upon information and belief, Individual Defendants were aware of this information, and

they gained it either through firsthand knowledge, communication with other jail employees,

and/or through review of documents related to Gary and/or his incarceration.

26.     Texas Ranger Laura Simmons interviewed Mr. Cole regarding Gary's death.  Mr.

Cole told Ms. Simmons that Hunt County jail personnel "treated [Gary] like a dog."  Upon

information and belief, the reference to jail personnel included most if not all Individual

Defendants.  Mr. Cole said that he notified Ms. Landers (a nurse), Ms. Wells (a nurse), Officer

Perdue, and Officer Camp.  Upon information and belief, these people were aware of Gary's

serious medical condition, as communicated to and observed by them, but they failed to take any

action to obtain needed emergency medical treatment for Gary away from the jail.  Mr. Cole

indicated that Officer Camp was the one that took Gary to court, and Gary was not able to go due

to hurting so badly.  Thus, upon information and belief, Officer Camp had firsthand knowledge,

by observing Gary, that Gary was seriously ill and needed immediate emergency medical

treatment.  Even so, upon information and belief, Officer Camp decided not to and did not obtain

that medical treatment.

27.     Mr. Cole also said that Ms. Wells pulled Gary out of the cell, ultimately bringing

him back and indicating that his blood pressure was low and that Mr. Cole needed to keep an eye

on him.  Mr. Cole said to Ms. Wells, "If his blood pressure low don't you think you need to do

something?"  It appears that the Hunt County jail was one in which it was expected that inmates

would care for each other, rather than competent medical personnel caring for them. This does not pass constitutional muster. Hunt County was constitutionally-responsible to care for Gary and not to allow other inmates, who were not only ill-equipped to do so but clearly unable to do so, to provide constitutionally-required medical care. Gary needed medical personnel in an emergency department of a local hospital to care for him, and no Individual Defendant obtained it for him despite knowledge of his serious condition gained through firsthand observation and/or communication with other Hunt County employees.

28.      Mr. Cole also told Ranger Simmons that Gary was showing that he needed medical help for a lengthy period of time, and that he had not eaten for days. He said that Gary was having chest and left arm pain from the time he arrived. Upon information and belief, Individual Defendants knew or had heard of such issues from other Hunt County employees. Upon information and belief, Individual Defendants, and others who worked with them, worked in a small enough workforce such that they would discuss with each other issues with inmates, such as Gary, and they did in fact discuss Gary's serious medical issues.

29.      Mr. Cole also told Ranger Simmons that Gary was called out for a blood pressure check. Gary was unable to even exit his bunk, and Mr. Cole told Ms. Landers, "Miss Landers he can't even get off the bunk." She responded, "Who is it?" Mr. Cole said, "That's Lynch the one you need to blood pressure." Mr. Cole said that there was a blood pressure check sheet for Gary on the log on the cart, but that medical personnel did not even enter the cell. He indicated that Ms. Landers "just wrote it off like he didn't even want his blood pressure checked." Upon information and belief, blood pressure check sheets included false entries. Such entries were designed to mask the deliberate indifference and objective unreasonableness of medical personnel, such as, upon information and belief, Ms. Campbell, Ms. Landers, and/or Ms. Wells, charged with caring for

Gary.

30.     Mr. Cole also said, regarding Officer Perdue, that he asked Officer Perdue to come to see what was wrong with Gary.  He said that he told Officer Perdue, "This man is here hurting." Officer Perdue responded, "Well, I'm going to check on it right now."  Officer Perdue asked Mr. Cole what was wrong with Gary, and Gary responded, "Man, I been trying tell them I need some help, I'm sick, my chest has been hurting, I can't get out of the bunk . . . ."  Thus, upon information and belief, Gary had told every Individual Defendant with which he had contact that he needed medical help, that he was sick, that his chest was hurting, and/or that he could not get out of his bunk, and/or they had made observations of Gary and thereby learned of such inforemation. Further, upon information and belief, Gary's serious medical issues were apparent to any observer at the time he was originally incarcerated at the Hunt County jail during the period concluding with his death in that jail.

31.     Officer Perdue said that he was going to go down and Get Gary a bottom bunk and do one or more other things.  However, according to Mr. Cole, Officer Perdue never did that and/or anything else for Gary.  Upon information and belief, Officer Perdue was aware of Gary's serious medical condition, and had the ability to contact someone to obtain needed emergency medical treatment for Gary, but he chose not to do anything about it.

32.     At another point during his statement to Ranger Simmons, Mr. Cole indicated that Ms. Wells said that they would check Gary's blood pressure.  At that time, Mr. Cole said that, when Gary was brought back, Mr. Cole was told, "Look Cole, his blood pressure is low, can you please keep an eye on him?"

33.     Mr. Cole also said that, on another occasion, he told Officer Marriott, "This man in here, his name Lynch, he been hurting and complaining about he been . . . need some help."  The

officer responded, "Ah, they already know about him."  Thus, upon information and belief, Officer Marriott was fully aware of Gary's serious medical issues which needed emergency medical treatment, and further knew that no one else had obtained that treatment for him, but chose to do nothing regardless.  Further, upon information and belief, as with all other Individual Defendants, Officer Marriott had the ability to obtain medical treatment for Gary if he had chosen to do so.

34.     Mr. Cole asked Ranger Simmons, if they already knew about him, why didn't they do anything for him?"  He also said, "And just like they blew it off."  Upon information and belief, the statement that "they" already knew about Gary's serious medical problems was further support that Individual Defendants, and more than likely other individual employees of Hunt County, knew that Gary needed medical treatment away from the jail but chose not to do anything about it.  Upon information and belief, if Individual Defendants had obtained needed emergency medical treatment for Gary, which they all had the ability to do, Gary would have lived.  Further, upon information and belief, Individual Defendants had opportunities before Gary's death to obtain that medical treatment, but they chose not to do so.

35.     Mr. Cole also described to Ranger Simmons the incident involving Sergeant York in Tarrant County.  He said that Gary was sitting on the ground, and his eye was red.  Mr. Cole said, "Man that's messed up, don't look right, what's wrong?"  Then Sergeant York "grabbed Lynch up and swung him around, he's like, 'Come on Lynch.'"  Mr. Cole's response was "like dang why they doing him like this, the man said he's sick, he can't walk, he hurting."  He and other inmates just shook their heads.  Thus, it was apparent to Sergeant York that Gary needed immediate medical attention.  Instead of obtaining that attention, upon information and belief, he simply put Gary into a cell.

36.     He also said that Gary had not been eating for several days, even before they were

all taken to Tarrant County after the gas leak.  He said that he saw a nurse check on Gary approximately two times the entire time he would have been able to make such observations.  Mr. Cole only saw Gary leave the cell once to visit a nurse, and once when he was out for a visit.  Upon information and belief, this was a visit with Gary's mother the Sunday or so prior to Gary's death. Further, upon information and belief, at the time of that visit, it was apparent to one or more Individual Defendants that Gary needed immediate medical treatment away from the jail – at an emergency department of a local hospital.  It is clear that a local hospital was available, based upon references to that hospital in other Hunt County jail deaths mentioned in this pleading below.

d.      Grigsby, Donald R. – Inmate

37.      Inmate Donald R. Grigsby gave a statement to Ranger Simmons related to Gary's death.  He stated, regarding Gary, "That man has been complaining about his shoulder was out of place, and he couldn't get up he was dizzy and stuff like that.  None of the guards would help him." Upon information and belief, that included more than one of Individual Defendants, who knew about Gary's physical issues including being dizzy.  He said that Gary was constantly moaning – every night.  He also said, "And then it got to a point to where it got bad you know what I'm saying.  I'm like I got to do something because this man is moaning.  They never pulled him out. They wouldn't take him.  This man had a visitor couldn't make it to his visit."  He also said that Gary did not eat for a period of time, which he estimated to be two weeks.  He further said that, even though Gary needed his blood pressure checked, jail employees would not give him a blood pressure check.  He said that Gary wouldn't get out of his bunk for weeks.  He said he wouldn't get up, and he wouldn't eat.  He also said that, when they had returned from Tarrant County, Gary collapsed by a wall.  He said that jail officials "snatched him up" and brought him back to his cell. Mr. Gray said that Gary said to them, "Man I can't, I'm sick.  I need some help."  Mr. Grigsby said that they would not help him and just put him into the cell.  Upon information and belief, such

people included one or more Individual Defendants.

38.     Mr. Grigsby was present when Gary died.  He said that people in the cell started yelling, "Y'all need to get down here, this man is dead!"  His recollection was that it took approximately 10, 15, or 20 minutes for jail personnel to arrive at the cell.  He also said, "But all of this could have been avoided if they would've helped him a long time ago."  He said that Gary was "complaining from day 1."  Without knowing it, Mr. Grigsby was describing legal deliberate indifference and objective unreasonableness.

39.     Mr. Grigsby also said that "we" told jail officials to check on Gary a few times. Upon information and belief, this included at least several of Individual Defendants.  Mr. Grigsby was so shaken by the situation with Gary that he said, "That's why I'm kinda to be honest with you I'm scared of my life being in the jail house.  Because what if something happens to me and I need help and they don't help me."

e.     Hobdy, Lee Clinton – Inmate

40.     Ranger Simmons also interviewed Lee Clinton Hobdy.  Mr. Hobdy indicated that he had been in the cell with Gary.  He said that Gary was complaining about medical problems from the time he came into the cell.  He said, "[W]e advised every officer and every nurse that was available at the time that, that was either at night time or day shift."  He said that cellmates were told that they were going to take care of Gary.  This occurred before the transfer to Tarrant County, but apparently no one moved Gary to a different bunk and/or provided medical treatment to him.

41.     Mr. Hobdy said that, on the day everyone came back from Tarrant County, Friday, Gary was pulled out last.  Gary sat down on the wall by the door and complained to jailers that he was not feeling well.  When Mr. Hobdy and Gary rode back from Tarrant County, Gary sat behind Mr. Hobdy and to his left.  Gary kept putting his head down and seemed like he was very sick. Gary complained to jailers and/or medical personnel the night before the day he died, but was

apparently unable to "give much of a fight to make them press the issue about getting him medical attention." Gary was a prisoner, and "he really couldn't refuse the orders."

42.     When Gary was sitting on the floor, visibly ill, when he and others had returned from Tarrant County, a jailer "jerked him up and told him, 'come on.' The jailer pretty much forced Gary into the cell. Gary died the next morning.

43.     Gary complained during his incarceration about headaches, being nauseated, and felling dizzy. Upon information and belief, such complaints were heard and/or known by Individual Defendants. Mr. Hobdy knew that Gary had low blood pressure as did, upon information and belief, all Defendants.

44.     Mr. Hobdy also said that Gary had not eaten any of his meals in several days. He also said that people in Gary's cell would tell jail representatives that Gary was not eating. They would tell such jail representatives that they needed to do something with Gary. This had been going on since Gary had initially been incarcerated in Hunt County.

45.     Moreover, Mr. Hobdy indicated that Gary had apparently not showered in quite some time. He never saw Gary get in the shower until the day that Gary died. When they left Tarrant County, Mr. Hobdy thought to himself, "Oh my god, this dude hasn't showered." He said that he could easily smell Gary's body odor. Upon information and belief, Individual Defendants likewise recognized that Gary had not showered, was ill, and/or was not eating. Mr. Hobdy said that they had spoken for some time about Gary's issues to both of the night shift nurses, and officers including an officer whose name starts with a "P," who is a heavy-set guy. Upon information and belief, that may have been Officer Kolbee Perdue. They were asked to get Gary medical attention, and a lower bunk, but nothing was done in response. Mr. Hobdy said the head nurse had been also refusing to provide medical treatment and "she always denies them from going

to the hospital seeking medical." Upon information and belief, this was Ms. Campbell. Mr. Hobdy indicated that this was an issue with other inmates as well. Mr. Hobdy said, ". . . that was my biggest concern with hearing him voice that. I was like, well nah they put him in here and knew he had medical problems but didn't put him in a place where he could be observed to keep him from being in the situation he's in now."

<u>f.      Hunter, Robert T. – Sergeant (Badge No. 3821)</u>

46.     Sergeant Robert T. Hunter provided a statement related to Gary's death. The statement indicated that other involved officers were Sergeant Leevey, Officer Bixler, Officer Briggs, Medical Officer Landers, Officer Norris, Officer Lewis, and Officer T. Roberson. Sergeant Hunter wrote that, on February 23, 2019, at approximately 11:18 a.m., he was standing in the 269/277 vestibule holding a door open so that he and others could move inmates that had retuned from the Tarrant County jail. He overheard a radio call for medical to respond to Northeast Cell 319. Sergeant Hunter responded to the cell, because he was the Sergeant-on-duty for the jail that day. Lieutenant Stroud relieved Sergeant Hunter from covering the door, so that he was able to go to Northeast Hallway.

47.     When Sergeant Hunter entered Cell 319, he saw Officer Bixler standing at Gary's bunk. He saw Officer Bixler performing a sternum rub on Gary's chest. He also saw that Gary was not responsive to the sternum rub. Sergeant Hunter then ordered Officer Bixler to assist Sergeant Hunter with moving Gary's body off of the top bunk and onto the cell floor. Officer Lewis was unable to locate a pulse, and Sergeant Hunter could not see any movement in Gary's chest. Ultimately, the AED was applied and turned on, but did not indicate that a shock would be appropriate. Paramedics ultimately arrived, but Gary had died.

48.     Upon information and belief, Gary had been deceased for quite some time. Further, Gary could have been saved if one or more Individual Defendants would have acted sooner. The

illness which caused Gary's death was curable, and there were signs of that illness for days before he died.  Individual Defendants ignored those signs, as related by witnesses referenced in this pleading, and were thereby deliberately indifferent to Gary's serious medical issues and acted in an objectively unreasonable manner.

g.      Jones, Roger Junior - Inmate

49.     Ranger Simmons also interviewed inmate Roger Jones regarding Gary's death.  He said that Gary began complaining the day he got to the jail about hardly being able to breathe.  Mr. Jones said that Gary "just really couldn't breathe."  He also said that Gary was constantly complaining to the nurse.  Upon information and belief, this was a reference to Ms. Campbell, Ms. Landers, and/or Ms. Wells.  Mr. Jones further said that the night before Gary died, Mr. Jones told the nurse, "He's having a hard time breathing."  Mr. Jones said, "She didn't pay it no attention.  She went on back down the hall down there."  Gary died the next morning, and Gary's life could have been saved if Individual Defendants had taken action by obtaining medical treatment for Gary.

50.     Mr. Jones said that Gary and "we" had been complaining to the nurses and they just would not, upon information and belief, do anything.  He said that "every one of them, everyone we told" would not do anything.  He even said that there was a piece of cloth hanging over the window to the cell.  He also said, "If they had walked off in there [the cell], when we first went to complaining and hollering at them, they could've saved [Gary's] life."  Mr. Jones also said, "It's cruel.  To me it's cruel, not just punishment."  Mr. Jones was correct in his layperson's view of the unconstitutional punishment which Gary was forced to suffer.  Mr. Jones also said that he was upset because of the way they were handling Gary.  In fact, they were all upset.  Mr. Jones further confirmed that Gary moaned all night, apparently in pain.

51.     Mr. Jones said that Mr. Jones had been in various jails over a period of time, had

the experience of jailers doing cell checks by actually entering a cell and doing a head count.  Mr. Jones said, "They don't do that here [in Hunt County]."  Thus, upon information and belief, jailers would not go in and check on Gary, even though they knew he had serious medical issues.  They would just very briefly glance through a window to the cell.  Mr. Jones said, "I hate that it happened, it didn't need to happen, you know like I said.  They came in that night, they could have probably saved him.  That morning, he was, he was gone."  He said that the nurses that night were the same nurses that went to Tarrant County and then returned to Hunt County.

h. <u>Landers, Helen M. – Medical Officer (Badge No. 3704)</u>

52. Medical Officer Helen M. Landers wrote that, at 11:31 a.m. on February 23, 2019, she was called to go to NE Hall over the radio by Officer Braggs.  Inmates in Gary's cell – NE 319 – were sitting on the table and chairs pointing and yelling at Gary.  They started yelling, "He's died!"  Medical Officer Landers put on a glove and stepped on the bottom bunk to reach up and check for Gary's pulse.  Gary was cold to the touch.  He also had dried saliva around his mouth.  He was unresponsive when Medical Officer Landers called his name.  Upon information and belief, Gary had been deceased for quite some time.  Further, upon information and belief, those Individual Defendants on duty at the time could have checked on Gary much earlier and saved his life by obtaining needed emergency medical treatment.

53. Medical Officer Landers then called a Code Blue over the radio, requesting other officers to respond.  Officer Bixler and Officer Lewis were the first two officers to respond to Tank 319.  Medical Officer Landers wrote, "At 7:24 a.m., Inmate Grigsby, Donald came out to get his medicine and said to Officer Teri Robinson 'Y'all need to move Inmate Lynch because he was making up too much noise and was talking (shit)' and Inmate Grigsby could not sleep.  He then said, 'If y'all don't do something, I will.'"  Upon information and belief, this was likely the last notice, after a lot of notice regarding Gary's issues over a number of days, regarding Gary's deathly

illness.

###### i.     Leevey, Roy D. – Sergeant (Badge No. 2725)

54.     Sergeant Roy D. Leevey responded to a "Code Blue" involving Gary, on February 23, 2019, in Cell/Tank 319.  Sergeant Leevey wrote in his statement that he entered the cell after Officers Hunter and Bixler.  He helped with moving Gary's body from the top bunk to the floor, so that CPR could begin.  He also ordered others, presumably inmates, to leave the cell.

###### j.     Parker, Antonio Dimitri – Inmate

55.     Inmate Antonio Parker also provided a statement to Ranger Simmons regarding Gary's death.  He said that he had been in the same cell as Gary for the relevant time period.  Mr. Parker said that Gary had complained about his chest, his head, and his shoulder.  He said that "everybody" was "telling the nurses."  He said that the nurses "wouldn't even help him."  Mr. Parker said that nurses would not even come into the tank to check Gary's blood pressure.  He said that he and his cellmates were telling the nurses about Gary for a couple of weeks, and that nobody would take Gary to see the nurse.  Upon information and belief, "the nurses" referred to Ms. Campbell, Ms. Landers, and/or Ms. Wells.

56.     Mr. Parker also said that Gary would not eat for weeks.  He said that they told jail staff that Gary was not eating.  He further said that people in Gary's cell would push the button on the intercom and tell jail personnel that Gary needed medical attention, and that this occurred before prisoners were moved to Tarrant County.  Upon information and belief, references to staff in this paragraph are references to more than one of Individual Defendants.

57.     Mr. Parker also noticed, when Gary returned from Tarrant County, that Gary's eyes were a yellow color.  Gary told one or more jailers and/or medical people that he needed help.  Gary's eyes were so yellow that Mr. Parker and a cellmate called Gary "Yella."  Even so, nobody

came in to check on Gary, or take his blood pressure.  When Gary complained about his chest, he complained that he could barely breathe.  One time, when Gary was called for court, he was sweating profusely.  Gary also could not walk.  Even so, jailers and/or nurses refused to provide a wheelchair to him.  Mr. Parker said that "all of them" knew of Gary's issues.  Upon information and belief, "all of them" referred to at least several Individual Defendants.  Upon information and belief, both Officer Robinson and Medical Officer Landers knew that the sounds Gary was making were due to serious medical issues he was having, and for which he had needed emergency medical treatment for quite some time.

58.     Mr. Parker said, "We kept telling the nurse he need some attention."  The response would typically be that Gary would be alright.  They would then refuse to provide any medical treatment to Gary and/or have him taken to a local hospital emergency room for needed medical treatment.  Mr. Parker said that there is a difference between a medical officer and a nurse, and that a medical officer wore a suit.  Mr. Parker said that Gary's cellmates told the nurses and the floor officer, which were different people who changed over time.

### k.     Robinson, Teri J. – (Badge No. 3337)

59.     Officer Teri J. Robinson wrote a report related to Gary's death.  She indicated that, on February 23, 2019, at approximately 7:24 a.m., Officer Robinson was escorting Medical Officer Landers around the NE Hallway while she (Medical Officer Landers) passed meds.  They were at Tank 319, and Inmate Grigsby came out to receive his meds.  While he was out, he stated to Medical Officer Landers and Officer Robinson that they needed to get "that guy" (Gary) out of the tank because he was "making noises," and it was keeping him awake.  Mr. Grigsby said that he was tired of it and wanted Gary moved.  He further said the noises sounded like Gary was "having sex," which was the best way he could describe the sounds.  Officer Robinson told Mr. Grigsby that Officer Robinson was not going to move an inmate who was snoring or moaning in his sleep.

However, upon information and belief, Officer Robinson knew that Gary was not simply just snoring or moaning in his sleep, as a healthy person might, but instead had serious medical issues that had been communicated to Individual Defendants.

60.     Officer Robinson further wrote that she conducted floor checks at 8:20 a.m., 9:03 a.m., 9:35 a.m., 10:00 a.m., 10:28 a.m., and 10:54 a.m. "without incident."  However, upon information and belief, "floor checks" constituted nothing more than pulling back a curtain and briefly glancing through a window into Cell 319.  Some such cell "checks" lasted approximately 2-3 seconds.  They did not include actually observing inmates face-to-face.  Moreover, since Gary was on the last upper bunk at the back of the cell, upon information and belief, he could not be sufficiently viewed by anyone conducting such a cursory cell check.  The person would need to actually enter the cell, walk to the back of the cell, and observe Gary.  This was deliberate indifference in light of the fact that, upon information and belief, Individual Defendants knew of Gary's serious medical issues and choose not to enter the cell and take any action.

61.     Officer Robinson also wrote that, at approximately 11:32 a.m., Officer Landers called a Code Blue in Tank 319.  This Code Blue was due to Gary dying.  Officer Robinson wrote, "The other inmates in tank 319 (including I/M Grigsby) were moved to the NE rec yard.  While I/M Grigsby passed by me I could hear him saying that this was our fault because he told us there was a problem and we did nothing about it."  Officer Robinson further wrote that neither Mr. Grigsby nor other inmates in the tank ever told Officer Robinson ("us") he/they felt like Gary needed medical assistance.  Officer Robinson further said there were no issues in Tank 319 until medical was called to check on Gary at the time of his death.  Upon information and belief, these last statements by Officer Robinson were false and made as a defense to the cause of Gary's death.

l.     Smith, Jerome Antwone – Inmate

62.     Inmate Jerome Antwone Smith indicated that Gary was ill from the time he arrived

at the jail.  He would not eat, and he also complained that he could not stand up for very long and that his blood pressure was low.  Mr. Smith also said, "He didn't get out the bunk never."  He further said that when Gary came back from court, he got right back into his bunk and couldn't eat because he was hurting.  This was true even before the transfer to Tarrant County.  Gary would moan all night, and he ultimately died in the bunk right next to Mr. Smith.

63.     Mr. Smith also said that Gary had great difficulty going to a jail visit with his mother due to his illness and having to stay in his bunk all the time.  Mr. Smith also said that the time that Gary went to visit the nurse's office, he came back after approximately 30 minutes.  He said that people were always telling floor officers and nurses to come to the cell.  Upon information and belief, this included the majority of Individual Defendants.  Mr. Smith believes that they should have taken Gary to the hospital.  The jail should have done so when they first found out that Gary was not eating.  Plaintiff agrees with Mr. Smith and asserts that Individual Defendants should have ensured that Gary was taken to a local hospital for emergency medical treatment.  He also said that the people in the cell told floor officers that Gary was not eating, so there was no doubt that they did not know.

### 3.     Death Reports

#### a.     Autopsy – Dallas County Medical Examiner

64.     Justice of the Peace Wayne Money, Precinct 1, Place 1, in Hunt County, requested an autopsy.  The autopsy was conducted at the Southwestern Institute of Forensic Sciences at Dallas, Office of the Medical Examiner.  Chief Deputy Medical Examiner Tracy J. Dyer signed the autopsy report.  Dr. Dyer, noting that Gary was found unresponsive in his bunk, without trauma, concluded that Gary died as a result of aortic valve endocarditis with myocardial abscess. In conjunction with that conclusion, which was also listed as a finding, Dr. Dyer noted:

a.     Cardiac hypertrophy (770 g);

      b.      Aortic valve vegetation;
      c.      Extensive abscess formation with necrosis in the interventricular septum;
      d.      Focal associated phenomena; and
      e.      Associated pleural and pericardial effusions.

Upon information and belief, had Gary received medical care at any juncture at which he or someone on his behalf had complained to one or more Individual Defendants, Gary would have lived and not been forced to undergo the pain and suffering he experienced for days before his death. The medical issue causing Gary's death was curable, and had he been taking to a local emergency room, he would have received appropriate treatment and lived. Instead, Individual Defendants' failure to do anything for Gary resulted in a death sentence for a pretrial detainee, and significant unnecessary pre-death suffering.

### b.     Inmate Death Reporting Form – Hunt County Sheriff's Office

65.     The Hunt County Sheriff's Department filed an Inmate Death Reporting Form with the Texas Commission on Jail Standards. Captain Tammy Sherman completed the form. The form indicated that Gary was booked in at 4:35 p.m. on February 12, 2019, and that he died at 11:57 a.m. on February 23, 2019. It also indicates that the last face-to-face contact with Gary was at 10:54 a.m., although Captain Sherman describes it as just a "visual observation." A "very brief visual observation of the cell through a window, and no specific face-to-face observation of Gary," would be a more accurate description. Captain Sherman wrote that inmates in the cell found Gary, deceased. Captain Sherman also wrote:

> Last visual observation of the inmates in the cell was made at 10:54 am by Officer Teri Robinson, Inmates in cell 319 called the control room at 11:18 am requesting assistance. Officers immediately responded and found inmate Lynch unresponsive on the top bunk. They removed inmate Lynch from his bunk and moved him to the floor on a mat. CPR was started immediately with the help of AED. 911 was called and AMR arrived at 11:27am. They loaded him on the stretcher and continued CPR efforts all the way out the door of the jail and to the hospital where inmate Lynch was pronounced dead at the hospital at 11:57 am.

The "visual observation" purportedly made by Officer Robinson was nothing more than a glance

through a window into the cell.  Gary was at the back of the cell, on a top bunk, and could not be easily seen by such a glance through the window.  There were eight inmates in the cell, and they could not be properly observed, to be sure that they were healthy and not in need of medical care, through such a glance.  Upon information and belief, this type of purported "check" was consistent with Hunt County policy, practice, and/or custom.  Nevertheless, an individual, such as any Individual Defendant is not excused from his or her obligation to comply with the United States Constitution simply because his or her employer chooses to have a policy, practice, and/or custom which violates the Constitution.

### c.     Inquest Report – Judge Money

66.     An inquest was performed by Justice of the Peace Wayne Money.  Judge Money generated a brief report as a result.  He (or someone on his behalf) wrote that Gary was an inmate at the Hunt County jail, in Cell Number 319.  Gary was on the top bunk and would not "wake up."  Officers Hunter and Bixler removed Gary from the bunk and put his body onto the floor.  They were unable to obtain a pulse, and the AED reported that a shock was not advised.  Upon information and belief, this was due to officers waiting far too long after being notified of Gary's illness to take any action.

### C.     Investigation by Hunt County Sheriff's Department

67.     Hunt County Sheriff's Office conducted an investigation regarding Gary's death, and it generated reports and other documents as a result.  Documents indicate that Gary was booked in on February 12, 2019, and that he died 11 days later on February 23, 2019.  He had been arrested without incident, "peacefully," due to an outstanding warrant, and he was sober at the time of arrest.

68.     A floor log dated February 22, 2019, for Floor Officer Carrera, indicates a number of alleged visual observations beginning at 9:38 p.m. and concluding at 4:44 a.m., presumably on

February 23, 2019.  One entry, for 1:30 a.m. on February 23, 2019, indicates that Tank 319 was "fed."  The log also indicates that there were 8 inmates in Cell 319, on the Northeast Hall/Pod.

69.     A floor log for February 23, 2019, beginning at 5:30 a.m., once again lists a number of visual observations.  That floor log indicates as floor officers Carrera (#3814) and Robinson (#3337).  Neither log indicates anything regarding what happened to Gary or anything regarding Gary's serious, deadly condition or requests for needed health care.

70.     One document, entitled "Officers who Supervised Inmate Lynch's hallway [sic]" lists the following information:

| Date | Days/Nights | Officer/Comments |
|---|---|---|
| 02/13/2019 | Days | Marriott |
| 02/13/2019 | Nights | Robrecht/Brown |
| 02/14/2019 | Days | Marriott |
| 02/14/2019 | Nights | Castro |
| 02/15/2019 | Days | Westbrook |
| 02/15/2019 | Nights | Edmiston |
| 02/16/2019 | Days | Swatsell |
| 02/16/2019 | Nights | Adair |
| 02/17/2019 | Days | Swatsell |
| 02/17/2019 | Nights | Edmiston |
| 02/18/2019 | Days | Klein/Palmer |
| 02/18/2019 | Nights | Brown/Stailey |
| 02/19/2019 | Days | Brown/Marriott |
| 02/19/2019 | Nights | Moved to Tarrant County, Brown, Castro, Stailey |
| 02/20/2019 | Days | Marriott, Goble, Westbrook |
| 02/20/2019 | Nights | Castro, Brown, Stailey |
| 02/21/2019 | Days | Castro, Marriott, Westbrook, Goble |
| 02/21/2019 | Nights | Can't find the log |
| 02/22/2019 | Days | Can't find the log |
| 02/22/2019 | Nights | Carrera – moved back from Tarrant |
| 02/23/2019 | Days | Teri Robinson |

71.     Hunt County records indicate that the following people were inmates housed in the same cell as Gary:

- Brown, Adolphus
- Cole, Eugene
- Grisby, Donald R.
- Hobdy, Lee Clinton
- Jones, Roger Junior
- Parker, Antonio Dimitri
- Smith, Jerome Antwone

72.     Floor logs for the time period Gary was incarcerated at the Hunt County jail provide little useful information regarding what was actually observed and/or done – if anything.  They primarily indicate that visual observations were made at certain times.   Moreover, upon information and belief, those visual observations involved nothing more than looking into the window of the multi-person cell in which Gary was incarcerated.  Gary was at the back of that cell, on a top bunk, and, upon information and belief, could not be appropriately viewed through such cursory observation.

73.     Upon information and belief, Sergeant Jeff Haines with Hunt County Sheriff's Office Professional Standards conducted an investigation into Gary's death.  He provided a written warning to Ms. Campbell, in an Administrative Investigation Warning document dated April 16, 2019.  Sergeant Haines also, in writing, instructed Medical Supervisor Jana Campbell to respond in memo form regarding medical documentation for Gary.  Sergeant Haines wrote, "Specifically, the concerns regarding the 'Blood Pressure Check Sheet' and which staff members made documentations.  The 'CCQ' documentation and whether or not Transicare had been notified and if not why."  Medical Supervisor Campbell was instructed to return to the memo no later than noon on April 22, 2019.

74.     Sergeant Haines noted the tip of the iceberg regarding serious issues regarding medical documentation about Gary, beginning with the Blood Pressure Check form.  No blood pressure readings or checks were entered for February 23, 2019, the date Gary died, even though

medicine had allegedly been passed out that morning to Gary's cell.  One clearly false entry was made for February 24, 2019 at 7:30 a.m. – the day after Gary died – indicating that Gary allegedly refused a blood pressure check.  That entry appears to have been for or by Officers with Badge Numbers 3704 (Ms. Landers) and 3337 (Ms. Robinson).

**Hunt County Jail Services**        **Medical Infirmary**        **Blood Pressure Checks**

NAME: Lynch, Gary ____ DOB 2/16/87 ___ S.O.# 61987 _ Cell NE319
Medication Orders (Dose & Directions): ___ no meds _____

Rx Date: _____ Rx # _____ PHARM # _____
Treatment for Acute and Sudden Onset High Blood Pressure Reading:
Moderate Hypertension >160/100mg Hg → Clonidine 0.1mg tab P.O. and check Blood Pressure after 30min.
 • If BP remains elevated, provide additional Clonidine 0.1mg P.O.
Severe Hypertension >180/110mg Hg → Clonidine 0.2 mg tab P.O. and check Blood Pressure after 30min.
 • If BP remains elevated, but improved, provide additional Clonidine 0.1mg P.O.
 • If BP remains elevated > 160/100mm Hg after 30 min. from Clonidine total of 0.2mg → send
   patient to ER for evaluation.

| DATE | Time | BP Reading | 1st Medication Given ✔ | Time & BP Reading | 2nd Medication Given ✔ | Time & BP Reading | Action: Send to ER w/ Time | IM Initials | Badge# |
|------|------|------------|------------------------|-------------------|------------------------|-------------------|---------------------------|-------------|--------|
| 2/17/19 | 1445 | 93/53 107 | ∅ | | | | | done | 3520 |
| 2/17 | 2030 | NOT NEEDED | | | | | | Done | 3230 |
| 2/18 | 0650 | Refusal | | | | | | | 324 3830 |
| 2/18 | 2028 | Refused | | | | | | | 3786 |
| 2/19 | 0843 | Refusal | / | | | | | | 324 3741 |
| 2/19 | | | | | | | | | |
| 2/20 | 0853 | Refused | | | | | | / | 3570 |
| 2/20 | | | | | | | | | |
| 2/21 | 0807 | 109/04 134 | ∅ | | | | | done | 3570 |
| 2/21 | | Refused | | did not wake up | | | | | 3730 |
| 2/22 | 0724 | Refusal | | | | | | / | 3744 |
| 2/22 | 2255 | Refused | | | | | | / | 3786 |
| 2/23 | | | | | | | | | |
| 2/23 | | | | | | | | | |
| 2/24 | 0730 | Refusal | | | | | | / | 3704 3557 |

RLC 8/2016

Upon information and belief, other portions of the above-referenced form contained false

information.  Further, upon information and belief, no form was provided to Plaintiff's counsel's

office in response to Public Information Act Request, pre-suit, which provided any purported blood pressure readings and/or checks before February 17, 2019.

75.     Finally, upon information and belief, Gary did not refuse at least several – and possibly all – blood pressure checks which the above-refenced document indicates he refused. Upon information and belief, the policy, practice, and/or custom of taking blood pressure checks, or purporting to take blood pressure checks, of inmates in Gary's cell constituted nothing more than rolling a cart to a doorway to a sally port, which was outside of Gary's cell, and then waiting and/or calling for inmates who would exit the cell to have their blood pressure checked.  Thus, upon information and belief, there was not even a visual face-to-face request from any jail employee to Gary as to whether he wanted to have his blood pressure checked.  Moreover, upon information and belief, there was not even a visual pathway available, such that the jail employee at the cart could see Gary on the top bunk at the back of the cell.  Thus, a purported "refusal" by Gary to a blood pressure in fact constituted a refusal of the jail employee to walk into the cell and ask Gary directly whether he wanted a blood pressure check.  Upon information and belief, this was Hunt County policy, practice, and/or custom.

76.     Further, the phrase "did not wake up" in the table above further shows the deliberate indifference and objective unreasonableness in the manner in which blood pressure checks were purportedly conducted.  If a prisoner "did not wake up," the prisoner could be deceased or seriously ill.  This is further evidence that Hunt County's policy, practice, and/or custom of conducting cell checks and/or blood pressure checks was deliberately indifferent and/or objectively unreasonable.

77.     Sergeant Haines, upon information and belief, also noted that he could not read the writing on the intake form for Gary.  He also noted that, regarding the incarceration medical screening form, that there was no date on the document (to prove the date it was completed), and

for which time Gary was arrested.  He also noted that Question Number 4 was marked "Yes," which led him to question what was done in response.  The question was, "Do you have any major medical problems that need to be addressed at this time?"  He also wondered by there were only three pass-down logs for the entire month of February 2019.  The pass-down logs were for February 9, 2019, February 15, 2019, and February 24, 2019.  Pass-down logs are important, because they provide information to other jail officers coming on duty as to what occurred before their duty time.  He even noted that a document indicated that property was released to Gary several hours after Gary was deceased.  Clearly, there were significant problems, and likely fraudulent entries, on documents related to Gary's death.  Upon information and belief, this was to cover up the serious deliberate indifference and objective unreasonableness which resulted in Gary's death.

D.  Defendants' Knowledge and Education

78.  Individual Defendants had sufficient knowledge, training, and/or education to know that their failure to act regarding Gary's serious medical issues constituted deliberate indifference and objective unreasonableness, and moreover violation of the United States Constitution. Gary's medical issues were not complicated, and even laypeople would understand that a person who is experiencing chest pain, dizziness, and weakness should be taken immediately to a local hospital for potential emergency treatment.  Individual Defendants had the ability to obtain medical treatment for Gary, and could have saved his life had they done so, but they chose to do nothing about Gary's obvious serious medical issues.

79.  The Texas Commission on Law Enforcement ("TCOLE") keeps records of service histories and training and education of the Individual Defendants and which relate to jailer activities.  TCOLE records indicate that each of the Individual Defendants had sufficient experience and/or education to be fully aware that a failure to act reasonably, and/or being deliberately indifferent, would violate Gary's rights under the United States Constitution.

80.     TCOLE records indicate the following service history for Officer Camp:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer | Hunt County Sheriff's Office | Jailer License | 10/17/14 | |
| Jailer (Full Time) | Hunt County Sheriff's Office | Temporary Jailer License | 03/17/14 | 10/17/14 |

81.     TCOLE records indicate the following award history for Officer Camp:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporarily Jailer License | License | Granted | 03/17/14 |
| Jailer License | License | Granted | 10/17/14 |
| Basic Jailer | Certificate | Certification Issued | 03/02/15 |

82.     TCOLE records indicate that Officer Camp received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3517 | Suicide Prevention (not 3501) | 09/11/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 06/11/18 | 8 | Bill Blackwood LEMI of Texas |
| 3845 | CPR | 10/27/16 | 4 | Hunt Co. Sheriff's Office |
| 3830 | General First Aid Training | 08/16/16 | 2 | Hunt Co. Sheriff's Office |
| 3521 | The Basics of Minimum Jail Standards | 09/14/15 | 8 | Bill Blackwood LEMI of Texas |
| 3501 | Suicide Detection and Prevention in Jails (Inter) | 11/26/14 | 8 | Hunt Co. Sheriff's Office |
| 1007 | Basic County Jail Course | 10/16/14 | 96 | Hunt Co. Sheriff's Office |
| 3507 | PREA / Inmate Sexual Assault Prevention | 06/24/14 | 4 | Hunt Co. Sheriff's Office |
| 2086 | Jail Extraction | 06/17/14 | 8 | Hunt Co. Sheriff's Office |
| 3721 | County Correction Officer Field Training | 04/21/14 | 160 | Hunt Co. Sheriff's Office |

83.     TCOLE records indicate the following service history for Officer Campbell:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full Time) | Hunt County Sheriff's Office | Jailer License | 04/28/17 | |
| Jailer (Full Time) | Hunt County Sheriff's Office | Temporary Jailer License | 04/01/17 | 04/28/17 |

84.     TCOLE records indicate the following award history for Officer Campbell:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 04/01/17 |
| Jailer License | License | Granted | 04/28/17 |

85.     TCOLE records indicate that Officer Campbell received the following training and/or education which was, upon information and belief, relevant to claims against her in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3517 | Suicide Prevention (not 3501) | 09/13/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 04/05/18 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 04/27/17 | 96 | Hunt Co. Sheriff's Office |
| 3737 | New Supervisor's Course | 02/22/17 | 24 | Collin County Community College District – LEA |

86.     TCOLE records indicate the following service history for Officer Landers:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full Time) | Hunt County Sheriff's Office | Jailer License | 10/18/17 | 11/29/19 |
| Jailer (Full Time) | Hunt County Sheriff's Office | Temporary Jailer License | 11/06/16 | 10/18/17 |

87.   TCOLE records indicate the following award history for Officer Landers:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 11/06/16 |
| Jailer License | License | Granted | 10/18/17 |
| Basic Jailer | Certificate | Certification Issued | 10/22/17 |

88.   TCOLE records indicate that Officer Landers received the following training and/or education which was, upon information and belief, relevant to claims against her in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3517 | Suicide Prevention (not 3501) | 09/11/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 06/12/18 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 10/12/17 | 96 | Hunt Co. Sheriff's Office |
| 2086 | Jail Extraction | 08/08/17 | 8 | Hunt Co. Sheriff's Office |
| 3721 | County Correction Officer Field Training | 01/31/17 | 160 | Hunt Co. Sheriff's Office |
| 3930 | Ethics – General In-Service Training | 01/17/17 | 1 | Hunt Co. Sheriff's Office |
| 3507 | PREA / Inmate Sexual Assault Prevention | 07/17/17 | 3 | Hunt Co. Sheriff's Office |

89.   TCOLE records indicate the following service history for Officer Marriott:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Jailer License | 10/13/17 | |
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Temporary Jailer License | 01/30/17 | 10/13/17 |

90.   TCOLE records indicate the following award history for Officer Marriott:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 01/30/17 |
| Jailer License | License | Granted | 10/13/17 |

| Basic Jailer | Certificate | Certification Issued | 01/15/18 |

91.　　TCOLE records indicate that Officer Marriott received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3507 | PREA / Inmate Sexual Assault Prevention | 12/07/18 | 3 | Hunt Co. Sheriff's Office |
| 2086 | Jail Extraction | 10/04/18 | 8 | Hunt Co. Sheriff's Office |
| 3517 | Suicide Prevention (not 3501) | 09/11/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 04/05/18 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 10/12/17 | 96 | Hunt Co. Sheriff's Office |
| 2086 | Jail Extraction | 08/08/17 | 8 | Hunt Co. Sheriff's Office |
| 3721 | County Correction Officer Field Training | 04/11/17 | 160 | Hunt Co. Sheriff's Office |

92.　　TCOLE records indicate the following service history for Officer Perdue:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Full Time) | Bonham Police Dept. | Peace Officer License | 04/29/20 | |
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Jailer License | 10/21/16 | 04/22/20 |
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Temporary Jailer License | 02/15/16 | 10/21/16 |

93.　　TCOLE records indicate the following award history for Officer Perdue:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 02/15/16 |
| Jailer License | License | Granted | 10/21/16 |
| Peace Officer License | License | Granted | 04/29/20 |

| Basic Jailer | Certificate | Certification Issued | 01/30/17 |

94.    TCOLE records indicate that Officer Perdue received the following training and/or

education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 3517 | Suicide Prevention (not 3501) | 10/26/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 08/22/18 | 8 | Bill Blackwood LEMI of Texas |
| 2086 | Jail Extraction | 08/08/17 | 8 | Hunt Co. Sheriff's Office |
| 3830 | General First Aid Training | 12/21/16 | 8 | Hunt Co. Sheriff's Office |
| 3845 | CPR | 12/21/16 | 4 | Hunt Co. Sheriff's Office |
| 1007 | Basic County Jail Course | 10/20/16 | 96 | Hunt Co. Sheriff's Office |
| 3830 | General First Aid Training | 08/16/16 | 2 | Hunt Co. Sheriff's Office |
| 3507 | PREA / Inmate Sexual Assault Prevention | 05/25/16 | 3 | Hunt Co. Sheriff's Office |
| 3721 | County Correction Officer Field Training | 05/11/16 | 160 | Hunt Co. Sheriff's Office |

95.    TCOLE records indicate the following service history for Officer Robinson:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Peace Officer (Reserve) | Hunt Co. Sheriff's Office | Peace Officer License | 06/27/16 | |
| Peace Officer (Reserve) | Point Police Dept. | Peace Officer License | 10/31/14 | 10/02/15 |
| Peace Officer (Other) | Hunt Co. Sheriff's Office | Peace Officer License | 01/28/14 | 06/27/16 |
| Jailer | Hunt Co. Sheriff's Office | Jailer License | 10/30/12 | |

| Jailer (Full Time) | Hunt Co. Sheriff's Office | Temporary Jailer License | 07/11/12 | 10/30/12 |
| Peace Officer | Commerce Police Dept. | Peace Officer License | 03/21/07 | 06/26/08 |
| Reserve Officer | Commerce Police Dept. | Peace Officer License | 11/29/06 | 03/21/07 |

96.    TCOLE records indicate the following award history for Officer Robinson:

| Award | Type | Action | Action Date |
|-------|------|--------|-------------|
| Peace Officer License | License | Granted | 11/29/06 |
| Temporary Jailer License | License | Granted | 07/11/12 |
| Jailer License | License | Granted | 10/30/12 |
| Basic Peace Officer | Certificate | Certification Issued | 12/14/07 |
| Basic Jailer | Certificate | Certification Issued | 05/31/14 |
| Intermediate Peace Officer | Certificate | Certification Issued | 06/14/14 |
| Basic Instructor Proficiency | Certificate | Certification Issued | 10/06/14 |
| Intermediate Jailer Proficiency | Certificate | Certification Issued | 02/04/16 |
| Advanced Jailer Proficiency | Certificate | Certification Issued | 06/25/16 |
| Advanced Peace Officer | Certificate | Certification Issued | 09/03/20 |

97.    TCOLE records indicate that Officer Robinson received the following training and/or education which was, upon information and belief, relevant to claims against her in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|------------|--------------|-------------|--------------|-------------|
| 3517 | Suicide Prevention (not 3501) | 09/13/18 | 4 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 02/16/18 | 8 | Hunt Co. Sheriff's Office |
| 3845 | CPR | 10/27/16 | 4 | Hunt Co. Sheriff's Office |
| 3830 | General First Aid Training | 08/16/16 | 2 | Hunt Co. Sheriff's Office |

| 3504 | Use of Force in a Jail Setting (Intermediate) | 01/31/16 | 16 | TEEX Central Texas Police Academy |
|------|-----------------------------------------------|----------|----|-----------------------------------|
| 3037 | Liabilities of Supervisor/ Manager | 09/23/15 | 2 | Hunt Co. Sheriff's Office |
| 3502 | Inmate Rights and Privileges (Intermediate) | 07/31/15 | 16 | TEEX Central Texas Police Academy |
| 3519 | Objective Jail Classification | 11/30/14 | 4 | TEEX Central Texas Police Academy |
| 3501 | Suicide Detection and Prevention in Jails (Inter) | 11/25/14 | 8 | Hunt Co. Sheriff's Office |
| 3521 | The Basics of Minimum Jail Standards | 09/23/14 | 8 | Bill Blackwood LEMI of Texas |
| 2086 | Jail Extraction | 06/10/14 | 8 | Hunt Co. Sheriff's Office |
| 3721 | County Correction Officer Field Training | 06/10/14 | 8 | Hunt Co. Sheriff's Office |
| 3507 | PREA / Inmate Sexual Assault Prevention | 11/19/13 | 4 | Hunt Co. Sheriff's Office |
| 3500 | Jail | 12/19/12 | 8 | Bill Blackwood LEMI of Texas |
| 1007 | Basic County Jail Course | 10/29/12 | 96 | Hunt Co. Sheriff's Office |
| 3856 | First Aid / EMT / ECA (not course 3830) | 11/09/07 | 4 | Commerce Police Dept. (Training Rosters) |

98.    TCOLE records indicate the following service history for Officer Wells:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|--------------|------------|-------|--------------------|------------------|
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Jailer License | 10/16/15 | |
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Temporary Jailer License | 02/09/15 | 10/16/15 |
| Peace Officer | Hawk Cove Police Dept. | Peace Officer License | 01/30/06 | 03/30/06 |
| Peace Officer | West Tawakoni Police Dept. | Peace Officer License | 03/16/05 | 11/21/05 |

99.     TCOLE records indicate the following award history for Officer Wells:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Peace Officer License | License | Granted | 04/19/05 |
| Temporary Jailer License | License | Granted | 02/09/15 |
| Jailer License | License | Granted | 10/16/15 |

100.     TCOLE records indicate that Officer Wells received the following training and/or

education which was, upon information and belief, relevant to claims against her in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 4900 | Mental Health Training for Jailers | 05/21/18 | 8 | Bill Blackwood LEMI of Texas |
| 3930 | Ethics – General In-Service Training | 01/17/17 | 1 | Hunt Co. Sheriff's Office |
| 3507 | PREA / Inmate Sexual Assault Prevention | 01/17/17 | 3 | Hunt Co. Sheriff's Office |
| 3830 | General First Aid Training | 08/16/16 | 2 | Hunt. Co. Sheriff's Office |
| 3518 | Assessing for Suicide, Medical, and Mental Impairm | 03/16/16 | 4 | Bill Blackwood LEMI of Texas |
| 2086 | Jail Extraction | 01/07/16 | 8 | Hunt Co. Sheriff's Office |
| 1007 | Basic County Jail Course | 10/15/15 | 96 | Hunt Co. Sheriff's Office |

101.     TCOLE records indicate the following service history for Officer York:

| Appointed As | Department | Award | Service Start Date | Service End Date |
|---|---|---|---|---|
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Jailer License | 02/12/16 | |
| Jailer (Full Time) | Hunt Co. Sheriff's Office | Temporary Jailer License | 07/07/15 | 02/12/16 |

102.     TCOLE records indicate the following award history for Officer York:

| Award | Type | Action | Action Date |
|---|---|---|---|
| Temporary Jailer License | License | Granted | 07/07/15 |
| Jailer License | License | Granted | 02/12/16 |

| Basic Jailer | Certificate | Certification Issued | 06/21/16 |

103.    TCOLE records indicate that Officer York received the following training and/or education which was, upon information and belief, relevant to claims against him in this case:

| Course No. | Course Title | Course Date | Course Hours | Institution |
|---|---|---|---|---|
| 2086 | Jail Extraction | 10/04/18 | 8 | Hunt Co. Sheriff's Office |
| 3517 | Suicide Prevention (not 3501) | 09/13/18 | 8 | Hunt Co. Sheriff's Office |
| 4900 | Mental Health Training for Jailers | 04/05/18 | 8 | Bill Blackwood LEMI of Texas |
| 2086 | Jail Extraction | 08/08/17 | 24 | TEEX Central Texas Police Academy |
| 3014 | Mid-Management | 06/18/17 | 36 | Bill Blackwood LEMI of Texas |
| 3737 | New Supervisor's Course | 02/22/17 | 24 | Collin County Community College District – LEA |
| 3507 | PREA / Inmate Sexual Assault Prevention | 05/25/16 | 3 | Hunt Co. Sheriff's Office |
| 1007 | Basic County Jail Course | 02/11/16 | 96 | Hunt Co. Sheriff's Office |
| 2086 | Jail Extraction | 01/07/16 | 8 | Hunt Co. Sheriff's Office |
| 3521 | The Basics of Minimum Jail Standards | 10/14/15 | 8 | Bill Blackwood LEMI of Texas |
| 3721 | County Correction Officer Field Training | 09/03/15 | 160 | Hunt Co. Sheriff's Office |

E.    *Monell* Liability of Hunt County

1.    Introduction

104.    Plaintiff sets forth in this section of the pleading additional facts and allegations supporting liability claims against Hunt County pursuant to *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).  It is Plaintiff's intent that all facts asserted in this pleading, and not just the facts and allegations set forth in this section, relating to policies, practices, and/or customs of Hunt County support such *Monell* liability claims.  Such policies, practices, and/or customs alleged in

this pleading were moving forces behind and caused the constitutional violations and damages and death referenced herein.  Moreover, these policies, practices, and/or customs operated together to cause the constitutional violations and damages and death referenced in this pleading.

105.    Hunt County knew when it incarcerated Gary that its personnel, policies, practices, and/or customs were such that it could not or would not meet its constitutional obligations to provide appropriate medical treatment to Gary.  Hunt County made decisions about policy and practice which it implemented through its commissioner's court, its sheriff, its jail administrator, and/or through such widespread practice and/or custom that such practice and/or custom became the policy of Hunt County as it related to its jail.  The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege at the pleading stage the specific identity of Hunt County's chief policymaker, and Plaintiff does not do so.  Plaintiff merely suggests some final policymakers regarding issues in this case, and ultimately relies on the court to make that determination in accordance with Fifth Circuit precedent.

106.    There were several policies, practices, and/or customs of Hunt County which were moving forces behind, caused, were producing causes of, and/or proximately caused Gary's suffering and death, and other damages referenced in this pleading.  The County made deliberate decisions, acting in a deliberately indifferent and/or objectively unreasonable manner, when implementing and/or allowing such policies, practices, and/or customs to exist.  Further, when the County implemented and/or consciously allowed such policies, practices, and/or customs to exist, it knew with certainty that the result would be serious injury, suffering, physical illness, and/or death.

107.    Further, upon information and belief, the Hunt County Sheriff's Department, which was in charge of and ran the Hunt County jail, had a culture of disregard for the medical and/or

mental health needs of inmates.  This disregard worked together with other policies, practices, and/or customs mentioned in this pleading to be a moving force behind and cause, proximately cause, and be a producing cause of Gary's death and other damages referenced in this pleading.

2.      Hunt County Policies, Practices, and/or Customs

108.    Plaintiff lists beneath this heading Hunt County policies, practices, and/or customs which Plaintiff alleges, at times upon information and belief, caused, proximately caused, were producing causes of, and/or were moving forces behind all damages referenced in this pleading, including Gary's death.  These policies, practices, and/or customs individually, or two or more such policies, practices, and/or customs working together, caused all damages referenced in this pleading including Gary's death.  Thus, Hunt County is liable for all such damages.

109.    Hunt County had a policy, practice and/or custom of not providing annual suicide training to its employees.  The Hunt County jail was notified, on or about October 23, 2018, by Texas Commission on Jail Standards inspector Shane Sowell, that jail staff were not receiving four hours of annual suicide prevention training.  This was required in accordance with the TCJS-approved Mental Disability/Suicide Prevention Operation Plan.  Only then did Hunt County develop a class and lesson plan to train its jail employees regarding suicide prevention.  Suicides in Texas jails, as well as jails across not only the United States, but internationally, are a significant problem.  A jail that chooses not to train its employees regarding suicide prevention, when having clear and unabashed knowledge that suicides will occur absent such training, acts in a deliberately indifferent and objectively unreasonable manner.  Hunt County knew, to a moral certainty, when it chose not to train its employees annually in preventing and/or addressing suicides that death would occur. This is some evidence of Hunt County's deliberate indifference toward medical/mental health needs of inmates.

110.     Moreover, in April 2018, a review of Hunt County staff rosters showed that there were at least six (6) night shifts that were short-staffed.  A TCJS inspector also noted, when doing a walk-through, that the night shift at the time of the inspection was also short-staffed.  This is particularly troubling, because short-staffing, according to the document describing the review, indicates that there was not at least one person on duty for every 48 prisoners.  As with the failure to train employees regarding suicide prevention, the continued failure to appropriately staff the jail at night worked together with other policies, practices, and/or customs in this pleading to cause Gary's death and other damages referenced in this pleading.  Hunt County's blood pressure check practice, described elsewhere in this pleading, was a visual demonstration of the failure of Hunt County to have sufficient people on staff to address medical needs of inmates.  A single female employee would be forced to stand at a sally port door and hope that male inmates, eight-to-a cell, would exit the cell appropriately and receive needed medical care.  Obviously, when someone was seriously ill, such as Gary, this practice would certainly result in inmates not receiving reasonable medical care or even the taking of necessary vital signs.

111.     Hunt County had in place a written operational plan for an emergency, when the gas leak occurred.  As part of that plan, the jail administrator was to: "Call Greenville ISD transportation to arrange transport of inmates to the Kaufman County, Rains County, and Rockwall County Detention Centers."  Further, the jail administrator was to notify receiving agencies of incoming inmates.  However, upon information and belief, Hunt County knew that this policy was insufficient and would lead to injury and/or death of inmates with serious medical issues, such as Gary.  Upon information and belief, Gary and other inmates were held in a Tarrant County facility not contemplated by the written policy and not determined beforehand to be appropriate to house, and more importantly treat, inmates such as Gary with serious medical issues.  Thus, upon

information and belief, Hunt County's custom and practice differed from its written policy regarding an emergency such as the relevant gas leak.

112.    Hunt County Sheriff's Office had in place, at the time of Gary's incarceration, an Inmate Medical Services plan.  That written plan included: "Emergency medical treatment shall be available 24 hours a day, 7 days a week.  Any inmate in need of such treatment shall be transported by Sheriff's Department personnel to the Hunt Regional Medical Center, if jail medical staff cannot adequately treat the injury or illness.  However, upon information and belief, Hunt County's practice and/or custom differed from this written policy.  This difference is demonstrated through other allegations in this pleading, including the refusal of at least eight individuals – Individual Defendants – to obtain needed emergency medical treatment for Gary.

113.    The Hunt County Sheriff's Office also had in place, at the time of Gary's incarceration, a policy entitled "Inmate Headcounts."  The Formal Count portion of that policy reads in part:

> A formal count will be conducted at the beginning of each shift.  The floor officer will announce in each cell that count is being performed.  The inmates will be instructed to sit up on their bunks.  Inmates in administrative segregation may be required to stand at their door in order to provide a proper view of the inmate.  Using the computer generated call roster, the floor officer will call each inmate name and obtain a response.

The Hourly Check portion of the policy provides in part, "The floor officer will visually observe all inmates in each cell at least once each hour to insure [sic] the safety and welfare of inmates in their assigned area."  This policy, as others mentioned in this pleading, worked together to cause damages and death referenced in this pleading.  This written policy differed, upon information and belief, from the practice and/or custom of Hunt County as described elsewhere – cell "checks" occurred through pulling a curtain back followed by a brief, at times two-to-three seconds, viewing

inside the cell.  It is virtually impossible to view eight inmates in such a brief period of time and determine not only how many are in the cell, but whether they are safe and/or healthy.

114.    Upon information and belief, as demonstrated by the sheer number of Individual Defendants, and the high likelihood that individuals other than Individual Defendants knew of Gary's serious health issues and failed to do anything about them, and specifically to seek needed emergency medical care, the facts of this case are classic for a single-incident liability theory.  The failure to act was so pervasive that it demonstrated Hunt County policy, practice, and/or custom of ignoring serious medical needs of an inmate, such as Gary.  In the absence of serious physical trauma, 32-year-old people do not generally die if medical treatment is provided for known health conditions.  The demonstration of the custom of failing to provide medical care was shown in part by the number of Individual Defendants who refused to take action, as well as other allegations in this pleading.

115.    Hunt County's policy, practice and/or custom of allowing glances through windows into cells, such as that in which Gary was incarcerated, caused, were a proximate cause of, and were producing causes of all damages referenced in this pleading, including Gary's death.  Such a policy did not allow jailers and/or medical personnel to actually assess inmates in a cell.  Instead, if an inmate is lying on a bunk, deceased, as was Gary, such a glance would not disclose such an inmate's condition.

116.    Hunt County also had a policy, practice, and/or custom of allowing cursory statements to be written of floor logs, even with eight-person cells, such as that in which Gary was incarcerated, were viewed.  This resulted in jailer-officers conducting cursory checks, simply writing the word "visual" at times.  This also enabled floor officers, if they chose to do so, to

simply complete forms while performing their duties in a rote manner without any concern about, and/or meaningful observation of, inmates.

117.    Further, upon information and belief, Hunt County had a policy, practice, and/or custom of allowing medical officers to complete blood pressure check sheets with times and dates of purported refusals when no such refusals occurred.  A "refusal" to medical treatment and/or evaluation presumes that the person to be treated and/or evaluated actually declined treatment and/or evaluation.  As is clear with regard to Gary, no such denial, or informed consent regarding denial, was obtained.  Hunt County's policy, practice, and/or custom was, upon information and belief, to simply wait for inmates to exit the cell and/or voice their desire to receive treatment. Hunt County had constitutional obligations to provide reasonable medical care to inmates, such as Gary.  Inmates did not have an obligation to seek out such treatment (although Gary did).  This policy, practice, and/or custom caused, proximately caused, and was a producing cause of damages and death referenced in this pleading.

118.    Upon information and belief, Hunt County had a policy, practice and/or custom of not requiring pass-down logs to be completed on a daily and/or shift basis.  This allowed a complete breakdown of communication within the jail and would not inform one shift as to what occurred on the prior shift.  This worked together with other policies, practices, and/or customs referenced in this pleading to cause Gary's suffering and death.

119.    Upon information and belief, Hunt County and, upon information and belief, Individual Defendants knew of the significant risk of people dying in jail if they were not provided appropriate medical care.  There have been additional deaths at Hunt County before Gary died, and there were deaths at the Hunt County jail after Gary died.  This was some evidence of the deliberate indifference and objective unreasonableness of policies, practices and/or customs at the

jail.  Moreover, it placed all Defendants on notice that, absent closely watching inmates such as Gary, serious injury and/or death would occur.

120.    Further, upon information and belief, Individual Defendants were not terminated and/or were not the subject of any significant adverse employment action as a result of Gary's death and/or events leading up to it.  This is some evidence of pre-existing policy, practice, and/or custom.  While the word "ratification" is often used with factual allegations such as those in this paragraph, what constituted the moving force behind damages and death referenced in this pleading was actually pre-existing policy, practice, and/or custom.  Hunt County's refusal to act against its employees after Gary's death, considering the egregious failure to provide care, evidenced unconstitutional pre-existing policy, practice, and/or custom.

121.    Finally, Hunt County Sheriff's Office training records for Medical Officer Landers indicate that she was evaluated as not competent to perform her job duties.  Training records indicate that, more than once, she was below average in her knowledge of jail standards, department policy and procedure, and inmate rules.  This was a repeated issue during her training, and she should not have been retained as an employee.  The failure and refusal of Hunt County to terminate her employment caused, was a proximate cause, and a producing cause of all damages and death referenced in this pleading.  Moreover, Field Training Officer Quick wrote, "I have also noticed that Officer Landers is Standoffish [sic] and slightly argumentative during instruction.  At this time I have found Officer Landers to be lacking in a good attitude towards the work environment and unapproachable at times by fellow Officers."

3.      Texas Commission on Jail Standards: Hunt County Jail Failed Inspections

122.    The Texas Commission on Jail Standards ("TCJS") is the regulatory agency for all county jails in Texas, as well as privately-operated municipal jails.  It periodically inspects those jails to determine whether they meet bare minimum standards.  The Hunt County jail has

continually failed to meet these minimum standards, over several years, and its continued failure, taken together with other policies, practices, and/or customs in this pleading, worked together to cause, proximately cause, and be a producing cause of damages and death referenced in this pleading. In fact, as of September 21, 2020, and since January 9, 2020, the Hunt County jail has been on the TCJS list of non-compliant jails. This pleading references inspection reports from early 2013, although the TCJS might have found the Hunt County jail to be non-compliant even before that time.

123.    The TCJS inspected the Hunt County jail, in Greenville, Texas, on February 13-14, 2013. While the TCJS did not indicate that the Hunt County jail was non-complaint at that time, it did note several areas of the jail showing signs of water leakage from the ceiling inside inmate cells. Walls were discolored. This required inmates to be relocated, and cells to be closed, until roof repairs could be made. The TCJS had to threaten issuing a notice of non-compliance if repairs were not promptly made. This failure to keep water from inside inmate cells was deliberate indifference to the health of inmates who might become ill as a result.

124.    The report requiring these repairs also indicated that the Hunt County jail was not informing a magistrate, as required by Texas law, when an inmate was brought into the jail and was an exact match for having received mental health services in the past. The failure to notify a magistrate is another indicator of the jail's custom of deliberate indifference to mental health needs of inmates.

125.    The TCJS also inspected the Hunt County jail February 27-28, 2014. The TCJS found that, on occasion, an inmate was kept in a holding cell over 48 hours. This exceeded minimum jail standards. The TCJS inspector also observed jail administration using the detox cell as a holding cell. This is not permitted. The inspector also determined that, regarding disciplinary

documentation, Hunt County jail administration was not waiting 24 hours after serving an inmate with a notice of his hearing before offering the inmate a disciplinary hearing waiver. This was simply more evidence of Hunt County jail's custom of disregard for the rights and needs of its inmates.

126.    The TCJS inspected the Hunt County jail again on April 9-10, 2015. The TCJS determined that deficiencies existed and determined that the jail was non-complaint. The inspector found a number of issues where the jail was not meeting bare minimum standards:

- The kitchen floor was worn away to the point that the floor could no longer even be sanitized, and the floor was no longer even properly pitched around floor drains to allow water to drain. This occurred even thought the issue was noted on the kitchen's last health inspection.

- Intercoms in the jail were not functioning, and were thus were unable to provide two-way audio communication at all times, as required by minimum jail standards, in the Northeast, Northwest, and female separation hallways.

- All jailers were not receiving life safety training upon employment, and quarterly thereafter, as required by minimum jail standards.

- Generators were not being tested weekly, as required by minimum jail standards.

- During a review of face-to-face observation documentation of inmates in the female segregation area, jailers exceeded the 15-minute limit between checks due to the intercoms not providing two-way audio communication at all times as required by minimum jail standards.

Once again, the Hunt County jail demonstrated a lack of commitment to health and safety of its inmates. One would think that Hunt County would cure these issues, after being notified more than once. But, problems at the Hunt County jail continued.

127.    On May 26-27, 2016, the TCJS inspected the Hunt County jail. Once again, the Hunt County jail failed the inspection. The Hunt County jail was again listed as being non-compliant. The TCJS inspector found numerous issues:

- There were problems with the fire panel, and it could not be reset to normal mode.

- When the inspector reviewed inmate medical information, the inspector found that an inmate did not have a completed mental health screening tool as required by minimum jail standards.

- The inspector found, when reviewing TB tests for employees, that 18 jailers did not receive their annual tests as required by minimum jail standards. \

- The inspector also found, when walking through the facility, several issues requiring repair, including ceiling leaks, gaps in cells, and a sink leak.

128.    On July 23, 2016, the TCJS conducted a special inspection.  Upon information and belief, this was due to the suicide death of inmate Jason Edward Donnell.  The Hunt County jail was listed as being non-compliant, because it failed to notify the magistrate in accordance with minimum jail standards as to an inmate who was determined to be mentally disabled and/or suicidal.  This showed conscious disregard for the inmate's mental health issues and unfortunately apparently resulted in that inmate's suicide.

129.    On April 18, 2018, the TCJS conducted another inspection of the Hunt County jail.  Once again, the Hunt County jail failed the inspection and was listed as being non-compliant.  There were numerous issued listed in the report:

- There were two large holes in the foundation of the jail.  There were also numerous holes in the ceiling of the secured facility, and they were covered with plywood and non-detention grade screws.

- The fire system was tested under generator power.  The fire panel, after being triggered from a smoke alarm, displayed a trouble code.  Staff was unable to reset the system back to normal while under emergency power.

- While reviewing inmate files, the TCJS inspector discovered two files containing medical records that were not separated.  Those documents included the CCQ and Screening Form for Suicide Medical and Mental Developmental Impairments.

- During a review of classification files, the TCJS inspector noted that Hunt County was not following its own approved plan.  Inmates were to have their

first initial reassessment within 60 days after the initial assessment, but reviewed files were consistently over the 60 days on the first reassessment.

- The TCJS inspector reviewed classification files and discovered that inmates were not being accurately reassessed using the proper form in their approved plan. All inmates with an assaultive felony and a certain initial assessment custody were never lowered in custody. This even included inmates who displayed no institutional behavior problems.

- Jail staff were not receiving four hours of suicide prevention in-service training annually, which was required by the Hunt County approved operational plan.

- The TCJS inspector noted that, on suicide observation logs, observations had to be conducted within ten minutes. However, observations were documented to be over the ten-minute limit from six-to-eight minutes on a continuous basis.

- Officers were not documenting the time restraints were removed, after physically restraining an inmate.

- The TCJS inspector noted, when reviewing staff rosters, that there were at least six night shifts that were short-staffed during the month of April 2018. Inspectors also observed the night shift to be short-staffed on the day of inspection.

- The Hunt County jail was, once again, not following its own approved operational plan regarding sanitation. Inmates were receiving cleaning supplies every other day and not daily, as required.

- There were, as described by the TCJS inspector, "Multiple maintenance issues. These involved lavatories which allowed water to flow over the faucet head, loose privacy shields, tables with missing bolts, holes in concrete walls, television stands missing bolts, exposed electrical boxes, burned out lights throughout the facility, a telephone with exposed wiring, furnishings not secured with detention-grade screws, large unfilled cracks in the walls, and more."

- During a review of disciplinary incidents, the TCJS inspector noticed that staff were not following the approved operational plan. This was considered a violation of due process.

- The TCJS inspector also noted that, regarding disciplinary incidents, the Hunt County jail was not complying with the approved inmate handbook.

- The inspector also noted, when reviewing grievances, that the inspector was unable to verify any written responses from the grievance officer being

provided to inmates in accordance with the Hunt County jail approved operational plan.

- Finally, while reviewing inmate files, the inspector noted a request to participate in educational and rehabilitation services. She was denied solely because of her charge at the time and not whether she would pose a serious risk to inmate or officer safety and/or negatively impact jail security.

This is perhaps one of the longest lists of non-compliance issues which the TCJS has issued over the last several years. It is simply further evidence of Hunt County's custom of lack of care and/or consideration of its inmates' medical and other issues.

130.   Nevertheless, the Hunt County jail decided to continue being a non-compliant jail. On February 25-26, 2019, the TCJS conducted yet another inspection of the Hunt County jail. As it had for prior yearly inspections, it failed. It was once again listed as non-compliant. The TCJS inspector found a number of issues:

- Amazingly, deficiencies from the 2018 annual inspection still existed. The jail had not completed repairs to the foundation, and there were numerous holes in the ceiling which were still covered with plywood and non-detention grade screws.

- During the review of the thirty-minute face-to-face observations of inmates in the holding cell, the TCJS inspector noted that staff exceeding the thirty minutes required by TCJS minimum standards by as little as one minute by as much as up to twenty-nine minutes.

- Deficiencies from the 2018 annual inspection, regarding sanitation, still existed. The inspector wrote that there were "multiple sanitation issues." All showers, except a few which had recently been remodeled, had peeling paint and were covered in an unknown black substance. Privacy shields contained severe rust on the panels, and the mounting points on the floor.

- Finally, deficiencies from the 2018 annual inspection still existed regarding facility maintenance. There were still multiple maintenance issues.

Clearly, Hunt County cared little about complying with minimum jail standards and/or its constitutional obligations.

131.    On January 6-7, 2020, the TCJS inspected the Hunt County jail once again. As it had for several years in a row, the Hunt Count jail failed. It was once again listed as non-compliant, as it continues to be listed as of the week this pleading was finalized in September 2020. The inspector found issues including:

- The generator to the jail annex had an improper transfer time.

- Showers throughout the main jail had exposed concrete, fruit flies and still, an unknown black substance on the walls. The shower sanitation issues were a deficiency on the 2018 and 2019 annual inspections. The inspection team also observed sanitation issues in the kitchen, including unresolved areas identified from the 2019 health inspection report.

- The main jail was identified to have false secure door indicators on the control board. Numerous lights were still out throughout the facility, and there were several exposed wall joint gaps as well.

It appears that Hunt County simply does not care about meeting minimum standards. Hunt County's failure, over a number of years, to bring itself into compliance with just bare minimum standards demonstrates its policy, practice, and/or custom of deliberate indifference and objective unreasonableness toward the needs of pre-trial detainees in its care. This, taken together with all other policies, practices, and/or customs asserted in this pleading, shows deliberate indifference and objective unreasonableness which unfortunately resulted in and caused Gary's suffering and death.

            4.      Other Incidents

132.    Other incidents and deaths in the Hunt County jail are further evidence of unconstitutional conditions of confinement arising from Hunt County policies, practices, and/or customs referenced in this pleading, such conditions causing, proximately causing, and/or being

producing causes of Gary's death and other damages referenced in this complaint. These other deaths need not have occurred in the same way as, or result from the same cause(s) leading to, Gary's death. These deaths, which are the ultimate damages suffered by any inmate, evidence the result of policies, practices, and/or customs referenced in this pleading.

133.    On August 31, 2006, Hunt County jail inmate Glenda Marie Jackson was found deceased in an administrative segregation cell. She had been in the jail for approximately one week and been allegedly seen by a jail physician on August 30, 2006. Family members had attempted to provide the jail with prescription medication for Ms. Jackson's mental health problems and for alcohol withdrawal. The jail refused the prescriptions because they had purportedly expired. Thus, instead, new medications were prescribed on August 30, 2006, nearly a week after Ms. Jackson had been incarcerated with, upon information and belief, mental health issues and issues with withdrawing from alcohol. According to the custodial death report, Ms. Jackson had only been able to take two doses of medication before her death. Ms. Jackson was only 42 years old at the time of her death.

134.    On or about December 27, 2010, Randy Bruce Wallick died after being in the Hunt County jail. Mr. Wallick had been incarcerated for several months at the time. He was receiving medications for asthma and being bi-polar. At approximately 12:15 a.m. on December 27, 2010, Mr. Wallick indicated to other inmates in his cell that he was not feeling well. He then passed out and fell to the floor. He ultimately began to foam around his mouth. He was transported to Hunt Regional Hospital and pronounced deceased at 3:00 a.m.

135.    On November 21, 2012, Melanie Lynn Smith died after being in the Hunt County jail. On November 13, 2012, at approximately 6:00 p.m., Ms. Smith complained of knee pain. A medical supervisor spoke with Ms. Smith and determined that no medical attention was allegedly

necessary.  Ms. Smith was eventually transported to the Hunt Regional Medical Center in Greenville, Texas.  She died, as indicated above, on November 21, 2012 after a determination that she needed dialysis that the local hospital was unable to provide.

136.    On December 13, 2014, Amber Dawn Reed died after being in the Hunt County jail.  Ms. Reed was received from Rockwall County on December 9, 2014 at approximately 11:32 p.m.  She received some medical treatment at a local hospital before being incarcerated in Hunt County, and she was allegedly treated daily with certain prescribed medications while in the Hunt County jail.  However, certain medications were faxed and ordered on December 10, 2014, but were not started until December 12, 2014.  On the night of December 13, 2014, at approximately 8:00 p.m., Ms. Reed was found in distress in her cell.  She had visible bleeding.  Ms. Reed was transported to Hunt Regional Medical Center and pronounced deceased at approximately 11:39 p.m. by Justice of the Peace Wayne Money.  Ms. Reed was only 37 years old at the time of her death.  An autopsy report indicated that she passed away of acute lobar pneumonia.  There were concerns, reported by one officer to another, regarding medical records related to the death.  Moreover, as with Gary, the investigation regarding Ms. Reed's death indicated that she should have received needed medical treatment once it had become clear that she was deathly ill.

137.    On or about June 13, 2016, Jason Edward Donnell died by committing suicide, by hanging, in the Hunt County jail.  Mr. Donnell had been in a protective custody, single cell, for approximately three months.  "New Jailer on duty," according to the custodial death report, found Mr. Donnell hanging on his cell door, at approximately 6:05 a.m., by using his apparent jail-issued pants.

138.    On November 4, 2019, at approximately 2:36 p.m., Tiani Warden, a Hunt County jail inmate, was found unresponsive in her cell.  She was then transported to the hospital.  She had

initially been arrested by the Quinlan Police Department for the charge of public intoxication.  She was actually found in a ditch, intoxicated.  She had been in Holding Cell 270, by herself, and had allegedly been checked periodically.  However, she was found lying on the floor of her cell unresponsive.  Ms. Warden was only 52 years of age at the time of her death.  According to an email from Clifton King, to the Texas Commission on Jail Standards, Ms. Warden was not seen by jail medical staff or put on a detox protocol.  Instead, she was placed on a mental/suicidal watch when she was flagged by the Texas Commission on Jail Standards Suicide Screening Form.  The autopsy report indicated that Ms. Warden died as a result of the toxic effects of cocaine.

139.    On December 11, 2019, Mark Steven King, Jr. died after being in the Hunt County jail.  Mr. King was only 44 years of age at the time of his death, and he had been brought to the jail by the West Tawakoni Police Department.  The arresting officer believed that Mr. King was suicidal.  Mr. King was later found to be unresponsive in his cell.  However, this occurred after Mr. King was asking a sergeant about a "lady in the trash can."  There was no one in the trash can, and there was nobody in the area that Mr. King was addressing.  Further, Mr. King had been brought back to the jail from court, because he apparently believed that he was seeing his mother at the courthouse when such persons were not present.  A serious incident report regarding Mr. King's death indicated that he was found lying on his stomach and not breathing.  Another report indicated that he was rolled over onto his back, and he already had a bluish skin color.  An officer felt no pulse at that time.

III.    Causes of Action

    A.    14th Amendment Due Process Claims Under 42 U.S.C. § 1983: Objective Reasonableness Pursuant to *Kingsley v. Hendrickson*

140.    In *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), a pretrial detainee sued several jail officers alleging that they violated the 14th Amendment's Due Process Clause by using

excessive force against him. *Id*. at 2470.  The Court determined the following issue: "whether, to prove an excessive force claim, a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officer's use of that force was *objectively* unreasonable." *Id.* (emphasis in original).  The Court concluded that the objectively unreasonable standard was that to be used in excessive force cases, and that an officer's subjective awareness was irrelevant. *Id.* The Court did so, acknowledging and resolving disagreement among the Circuits. *Id.* at 2471-72.

141.    The Court flatly wrote "the defendant's state of mind is not a matter that a plaintiff is required to prove." *Id.* at 2472.  Instead, "courts must use an objective standard." *Id* at 2472-73.  "[A] pretrial detainee must show only that the force purposefully or knowingly used against him was objectively unreasonable." *Id.* at 2473.  Thus, the Court required no *mens rea*, no conscious constitutional violation, and no subjective belief or understanding of offending police officers, or jailers, for an episodic claim but instead instructed all federal courts to analyze officers', or jailers', conduct on an objective reasonability standard.  Since pretrial detainees' rights to receive reasonable medical and mental health care, to be protected from harm, and not to be punished at all, also arise under the 14th Amendment's Due Process Clause, there is no reason to apply a different standard when analyzing those rights.

142.    It appears that this objective reasonableness standard is now the law of the land.  In *Alderson v. Concordia Parish Corr. Facility*, 848 F.3d 415 (5th Cir. 2017), the Fifth Circuit Court of Appeals considered appeal of a pretrial detainee case in which the pretrial detainee alleged failure-to-protect and failure to provide reasonable medical care claims pursuant to 42 U.S.C. § 1983. *Id.* at 418.  The court wrote, "Pretrial detainees are protected by the Due Process Clause of the Fourteenth Amendment." *Id.* at 419 (citation omitted).  The Fifth Circuit determined, even

though *Kingsley* had been decided by the United States Supreme Court, that a plaintiff in such a case still must show subjective deliberate indifference by a defendant in an episodic act or omission case. *Id.* at 419-20.  A plaintiff must still show that actions of such an individual person acting under color of state law were "reckless."  *Id.* at 420 (citation omitted).  However, concurring Circuit Judge Graves dissented to a footnote in which the majority refused to reconsider the deliberate indifference, subjective standard, in the Fifth Circuit.  *Id.* at 420 and 424-25.[1]

---

[1] Circuit Judge Graves wrote: "I write separately because the Supreme Court's decision in *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), appears to call into question this court's holding in *Hare v. City of Corinth*, 74 F.3d 633 (5th Cir. 1996).  In *Kingsley*, which was an excessive force case, the Supreme Court indeed said: "Whether that standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here; for the officers do not dispute that they acted purposefully or knowingly with respect to the force they used against Kingsley."  *Kingsley*, 135 S.Ct. at 2472.  However, that appears to be an acknowledgment that, even in such a case, there is no established subjective standard as the majority determined in *Hare*.  Also, the analysis in *Kingsley* appears to support the conclusion that an objective standard would apply in a failure-to-protect case. *See id.* at 2472–2476.

Additionally, the Supreme Court said:

> We acknowledge that our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners.  We are not confronted with such a claim, however, so we need not address that issue today.

*Id.* at 2476.  This indicates that there are still different standards for pretrial detainees and DOC inmates, contrary to at least some of the language in *Hare*, 74 F.3d at 650, and that, if the standards were to be commingled, it would be toward an objective standard as to both on at least some claims.

Further, the Ninth Circuit granted en banc rehearing in *Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016), after a partially dissenting panel judge wrote separately to point out that *Kingsley* "calls into question our precedent on the appropriate state-of-mind inquiry in failure-to-protect claims brought by pretrial detainees."  *Castro v. County of Los Angeles*, 797 F.3d 654, 677 (9th Cir. 2015).  The en banc court concluded that *Kingsley* applies to failure-to-protect claims and that an objective standard is appropriate. *Castro*, 833 F.3d at 1068–1073.

In *Estate of Henson v. Wichita County*, 795 F.3d 456 (5th Cir. 2014), decided just one month after *Kingsley*, this court did not address any application of *Kingsley*.  Likewise, the two subsequent

143.   The majority opinion gave only three reasons for the court's determination that the law should not change in light of *Kingsley*.  First, the panel was bound by the Fifth Circuit's "rule of orderliness."  *Id.* at 420 n.4.  Second, the Ninth Circuit was at that time the only circuit to have extended *Kingsley's* objective standard to failure-to-protect claims.  *Id.*  Third, the Fifth Circuit refused to reconsider the law of the Circuit in light of United State Supreme Court precedent, because it would not have changed the results in *Alderson*.  *Id.*  Even so, the Fifth Circuit noted, nearly twenty-five years ago, that the analysis in pretrial detainee provision of medical care cases is the same as that for pretrial detainee failure-to-protect cases.  *Hare v. City of Corinth*, 74 F.3d 633, 643 (5th Cir. 1996).

144.   Thus, the trail leads to only one place – an objective unreasonableness standard, with no regard for officers' or jailers' subjective belief or understanding, should apply in this case and all pretrial detainee cases arising under the Due Process Clause of the 14th Amendment.  The Fifth Circuit, and the district court in this case, should reassess Fifth Circuit law in light of *Kingsley* and apply an objective unreasonableness standard to constitutional claims in this case.  The court should not apply a subjective state of mind and/or deliberate indifference standard.  The Supreme Court discarded the idea that a plaintiff, asserting claims due to treatment received by a non-convicted inmate, should have such a burden.

B.   Remedies for Violation of Constitutional Rights and Other Federal Claims

---

cases also cited by the majority did not address or distinguish *Kingsley*.  *Hyatt v. Thomas*, 843 F.3d 172 (5th Cir. 2016), and *Zimmerman v. Cutler*, 657 Fed.Appx. 340 (5th Cir. 2016).  Because I read *Kingsley* as the Ninth Circuit did and would revisit the deliberate indifference standard, I write separately."

145.    The United States Court of Appeals for the Fifth Circuit has held that using a State's wrongful death and survival statutes creates an effective remedy for civil rights claims pursuant to 42 U.S.C. § 1983.  Therefore, Plaintiff individually, and for and on behalf of Claimant Heirs, seeks, for causes of action asserted in this complaint, all remedies and damages available pursuant to Texas and federal law, including but not necessarily limited to the Texas wrongful death statute (Tex. Civ. Prac. & Rem. Code § 71.002 *et seq.*), the Texas survival statute (Tex. Civ. Prac. & Rem. Code § 71.021), the Texas Constitution, common law, and all related and/or supporting case law. If Gary had lived, he would have been entitled to bring a 42 U.S.C. § 1983 action for violation of the United States Constitution and obtain remedies and damages provided by Texas and federal law.  Plaintiff incorporates this remedies section into all sections in this complaint asserting cause(s) of action.

C.    Cause of Action Against Individual Defendants Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

146.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Individual Defendants are liable to Plaintiff individually and to Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Gary's constitutional rights, including those for reasonable medical care, to be protected, and/or not to be punished.  These rights are likely guaranteed by the 4th, 8th, and/or 14th Amendments to the United States Constitution when considered in light of facts leading to Gary's death.

147.    Individual Defendants acted and failed to act under color of state law at all times referenced in this pleading.  They wholly or substantially ignored Gary's obvious serious medical needs, and they were deliberately indifferent to and acted in an objectively unreasonable manner

those needs.  They failed to protect Gary, by obtaining for him needed medical care, and instead left him in a cell to die.  Upon information and belief, Individual Defendants were aware of the excessive risk to Gary's health and safety and were aware of facts from which an inference could be drawn of serious harm, suffering, and death.  Moreover, upon information and belief, they in fact drew that inference.  Individual Defendants violated clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incidents.

148.    Individual Defendants are also liable pursuant to the theory of bystander liability. Bystander liability applies when the bystander jailer/officer (1) knows that a fellow jailer/officer is violating a person's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act.  As demonstrated through facts asserted in this pleading, Individual Defendants' actions and inaction meet all three elements.  All Individual Defendants, regardless of their rank or position, had a duty and an obligation to assure that Gary was transported to an appropriate hospital and/or to call serious attention to Gary's serious medical issues, to their supervisors and/or others at Hunt County.  They chose not to do so.  Upon information and belief, they knew of fellow Hunt County employees who were likewise aware of Gary's serioius medical condition, and they knew that those fellow employees had failed to obtain emergency medical treatment for Gary and yet did not act in response to such knowledge.  Therefore, Individual Defendants are also liable to Plaintiff individually and Claimant Heirs pursuant to this theory.

149.    In the alternative, Individual Defendants' deliberate indifference, conscious disregard, state of mind, subjective belief, subjective awareness, and/or mental culpability are irrelevant to determination of constitutional violations set forth in this section of this pleading. The United States Supreme Court, in *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015), determined

the state of mind necessary, if any, for officers/jailers sued in a case alleging excessive force against a pretrial detainee in violation of the 14th Amendment's Due Process Clause. *Id* at 2470-71. Constitutional rights affording pretrial detainees protection against excessive force and reasonable medical care flow from the 14th Amendment's Due Process Clause. *Id*. Since such constitutional protections flow from the same clause, the analysis of what is necessary to prove such constitutional violations is identical.

150.    Individual Defendants are not entitled to qualified immunity.[2]  Their denial of reasonable medical care, and other actions and/or inaction set forth in this pleading, caused,

---

[2]    The defense of qualified immunity is, and should be held to be, a legally impermissible defense. In the alternative, it should be held to be a legally impermissible defense except as applied to state actors protected by immunity in 1871 when 42 U.S.C. § 1983 was enacted. Congress makes laws. Courts do not. However, the qualified immunity defense was invented by judges. When judges make law, they violate the separation of powers doctrine, and the Privileges and Immunities Clause of the United States Constitution. Plaintiff respectfully makes a good faith argument for the modification of existing law, such that the court–created doctrine of qualified immunity be abrogated or limited.

Individual Defendants cannot show that they would fall within the category of persons referenced in the second sentence of this footnote. This would be Defendants' burden, if they choose to assert the alleged defense. Qualified immunity, as applied to persons not immunized under common or statutory law in 1871, is untethered to any cognizable legal mandate and is flatly in derogation of the plain meaning and language of Section 1983. *See Ziglar v. Abassi*, 137 S. Ct. 1843, 1870-72 (2017) (Thomas, J., concurring). Qualified immunity should have never been instituted as a defense, without any statutory, constitutional, or long-held common law foundation, and it is unworkable, unreasonable, and places too high a burden on Plaintiffs who suffer violation of their constitutional rights. Joanna C. Schwartz, *The Case Against Qualified Immunity,* 93 Notre Dame L. Rev. 1797 (2018) (observing that qualified immunity has no basis in the common law, does not achieve intended policy goals, can render the Constitution "hollow," and cannot be justified as protection for governmental budgets); and William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 82 (2018) (noting that, as of the time of the article, the United States Supreme Court decided 30 qualified immunity cases since 1982 and found that defendants violated clearly established law in only 2 such cases). Justices including Justice Thomas, Justice Breyer, Justice Kennedy, and Justice Sotomayor have criticized qualified immunity. *Schwartz, supra* at 1798–99. *See also Cole v. Carson*, _ F.3d _, 2019 WL 3928715, at * 19-21, & nn. 1, 10 (5th Cir. Aug. 21, 2019) (en banc) (Willett, J., Dissenting). Additionally, qualified immunity

proximately caused, and/or were producing causes of Gary's suffering and death and other damages mentioned and/or referenced in this pleading, including but not limited to those suffered by Plaintiff and Claimant Heirs.

151.    Therefore, Gary's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Individual Defendants:

- Gary's conscious physical pain, suffering, and mental anguish;

- Gary's medical expenses;

- Gary's funeral expenses; and

- exemplary/punitive damages.

152.    Plaintiff also individually seeks and is entitled to all remedies and damages available to her for 42 U.S.C. § 1983 claims.  Plaintiff seeks such damages as a result of the wrongful death of her son.  Those damages were caused and/or proximately caused by Individual Defendants.  Therefore, their actions caused, were a proximate cause of, and/or were a producing cause of the following damages suffered by Plaintiff individually, for which she individually seeks compensation:

- loss of services that Plaintiff would have received from Gary;

- expenses for Gary's funeral;

- past mental anguish and emotional distress suffered by Plaintiff resulting from and caused by Gary's death;

---

violates the separation of powers doctrine of the Constitution. *See generally* Katherine Mims Crocker, *Qualified Immunity and Constitutional Structure*, 117 Mich. L. Rev. 1405 (2019) (available at https://repository.law.umich.edu/mlr/vol117/iss7/3).  Plaintiff includes allegations in this footnote to assure that, if legally necessary, the qualified immunity abrogation or limitation issue has been preserved.

- future mental anguish and emotional distress suffered by Plaintiff resulting from and caused by Gary's death;

- loss of companionship and society that Plaintiff would have received from Gary; and

- exemplary/punitive damages.

Exemplary/punitive damages are appropriate in this case to deter and punish clear and unabashed violation of Gary's constitutional rights. Individual Defendants' actions and inaction showed a reckless or callous disregard of, or indifference to, Gary's rights and safety. Moreover, Plaintiff individually, and also on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

> D.    Cause of Action Against Hunt County Under 42 U.S.C. § 1983 for Violation of Constitutional Rights

153.    In the alternative, without waiving any of the other causes of action pled herein, without waiving any procedural, contractual, statutory, or common-law right, and incorporating all other allegations herein (including all allegations in the "Factual Allegations" section above) to the extent they are not inconsistent with the cause of action pled here, Defendant Hunt County is liable to Plaintiff and Claimant Heirs, pursuant to 42 U.S.C. § 1983, for violating Gary's constitutional rights, including those to reasonable medical care, to be protected, and/or not to be punished. These rights are likely guaranteed by the 4th, 8th, and/or 14th Amendments to the United States Constitution when considered in light of facts leading to Gary's death.

154.    Hunt County acted or failed to act, through natural persons including Individual Defendants, under color of State law at all relevant times. Hunt County's policies, practices, and/or customs were moving forces behind and caused, were producing causes of, and/or were proximate

causes of Gary's suffering, damages, and death, and the damages suffered by Plaintiff and Claimant Heirs.

155.    The Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the appropriate chief policymaker at the pleadings stage.  Nevertheless, out of an abundance of caution, the sheriff of Hunt County was the relevant chief policymaker over matters at issue in this case.  Moreover, in addition, and in the alternative, the Hunt County jail administrator was the relevant chief policymaker over matters at issue in this case.  Finally, in addition, and in the alternative, Hunt County's commissioners' court was the relevant chief policymaker.  Nevertheless, these are just suggestions as to the relevant chief policymaker(s), as the Fifth Circuit Court of Appeals has made it clear that Plaintiff need not allege the relevant final chief policymaker(s) at the pleadings stage.   The court will determine the appropriate chief policymaker(s) at the appropriate time.

156.    Hunt County was deliberately indifferent regarding policies, practices, and/or customs developed and/or used with regard to issues addressed by allegations set forth above.  It also acted in an objectively unreasonable manner.  Policies, practices, and/or customs referenced above, as well as the failure to adopt appropriate policies, were moving forces behind and caused violation of Gary's rights and showed deliberate indifference to the known or obvious consequences that constitutional violations would occur.  Hunt County's policies, practices, and/or customs, whether written or not, were also objectively unreasonable as applied to Gary.

157.    Therefore, Gary's estate and/or his heirs at law (Claimant Heirs) suffered the following damages, for which they seek recovery from Hunt County:

- Gary's conscious physical pain, suffering, and mental anguish;

- Gary's medical expenses; and

- Gary's funeral expenses.

158.    Plaintiff also individually seeks and is entitled to all remedies and damages available to her for 42 U.S.C. § 1983 claims.  Plaintiff seeks such damages as a result of the wrongful death of her son.  Hunt County's policies, practices, and/or customs caused, were proximate and/or producing causes of, and/or were moving forces behind and caused the following damages suffered by Plaintiff, for which she individually seeks compensation:

- loss of services that Plaintiff would have received from Gary;

- expenses for Gary's funeral;

- past mental anguish and emotional distress suffered by Plaintiff resulting from and caused by Gary's death;

- future mental anguish and emotional distress suffered by Plaintiff resulting from and caused by Gary's death; and

- loss of companionship and society that Plaintiff would have received from Gary.

Moreover, Plaintiff individually, and on behalf of Claimant Heirs, seeks reasonable and necessary attorneys' fees available pursuant to 42 U.S.C. §§ 1983 and 1988.

## IV.    Concluding Allegations and Prayer

### A.    Conditions Precedent

159.    All conditions precedent to assertion of all claims herein have occurred.

### B.    Use of Documents at Trial or Pretrial Proceedings

160.    Plaintiff and Claimant Heirs intend to use at one or more pretrial proceedings and/or at trial all documents produced by Defendants in this case in response to written discovery requests, with initial disclosures (and any supplements or amendments to same), and in response to Public Information Act request(s).

C.       Jury Demand

161.     Plaintiff and Claimant Heirs demand a jury trial on all issues which may be tried to a jury.

D.       Prayer

162.     For these reasons, Plaintiff asks that Defendants be cited to appear and answer, and that Plaintiff (Gwendolyn Carswell) and Claimant Heirs (Gwendolyn Carswell, Shonqua Franklin, Tywana Cobb, Michael Lynch, Roderick Cobb, Gary Valdez Lynch, Jr., Shonda Runnel, Alicia Gentry, and Ashley Gentry) have judgment for damages within the jurisdictional limits of the court and against all Defendants, jointly and severally, as legally available and applicable, for all damages referenced above and below in this pleading:

a)       actual damages of and for Gwendolyn Carswell, individually and as administrator of the referenced estate; and Shonqua Franklin, Tywana Cobb, Michael Lynch, Roderick Cobb, Gary Valdez Lynch, Jr., Shonda Runnel, Alicia Gentry, and Ashley Gentry, including but not necessarily limited to:

   •   loss of services that Plaintiff would have received from Gary;

   •   medical expenses for Gary;

   •   expenses for Gary's funeral;

   •   Plaintiff's past mental anguish and emotional distress resulting from and caused by Gary's death;

   •   Plaintiff's future mental anguish and emotional distress resulting from and caused by Gary's death;

   •   Gary's conscious physical pain, suffering, and mental health anguish; and

   •   Plaintiff's loss of companionship and society she would have received from Gary;

b)       exemplary/punitive damages for Plaintiff and Claimant Heirs, from Individual Defendants (George A. Camp, Jana R. Campbell, Helen M. Landers, Kenneth R. Marriott, Kolbee A. Perdue, Teri J. Robinson, Vi N. Wells, and Scotty D. York);

c)      reasonable and necessary attorneys' fees for Plaintiff and Claimant Heirs, through trial and any appeals and other appellate proceedings, pursuant to 42 U.S.C. §§ 1983 and 1988;

d)      court costs and all other recoverable costs;

e)      prejudgment and postjudgment interest at the highest allowable rates; and

f)      all other relief, legal and equitable, general and special, to which Plaintiff and Claimant Heirs are entitled.

Respectfully submitted:


Law Offices of Dean Malone, P.C.


        /s/ T. Dean Malone
          T. Dean Malone

T. Dean Malone
Attorney-in-charge
dean@deanmalone.com
Texas State Bar No. 24003265
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:   (214) 670-9989
Telefax:       (214) 670-9904

Of Counsel:

Michael T. O'Connor
Texas State Bar No. 24032922
michael.oconnor@deanmalone.com
Kristen Leigh Homyk
Texas State Bar No. 24032433
kristen.homyk@deanmalone.com
Law Offices of Dean Malone, P.C.
900 Jackson Street, Suite 730
Dallas, Texas 75202
Telephone:       (214) 670-9989
Telefax:           (214) 670-9904

Christopher B. Rehmet
Texas State Bar No. 24035414
service@tatelawoffices.com
Tate Rehmet Law Office, P.C.
2902 N. U.S. Highway 75
Sherman, Texas 75090
Telephone:       (903) 892-4440
Telefax:           (903) 893-5558

Attorneys for Plaintiff

<u>Certificate of Service</u>

I hereby certify that on December 7, 2020 I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court, and the electronic case filing system sent a notice of electronic filing to the following attorneys:

Mr. Thomas P. Brandt
Mr. John D. Husted
Fanning Harper Martinson Brandt & Kutchin, P.C.
Two Energy Square
4849 Greenville Ave., Suite 1300
Dallas, Texas  75206

Attorneys for Defendants


 /s/ T. Dean Malone             
T. Dean Malone